## Commonwealth ex rel. Derr *v.* Derr et al., Appellants.

Argued March 2, 1942.

Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Pearson M. Judd,* with him *George W. Ellis,* for appellant.

*Francis D. Mahon,* with him *Stanley F. Coar* and *David J. Reedy,* for appellee.

OPINION BY KENWORTHEY, J., April 15, 1942:

In this habeas corpus proceeding, the relator, the father, was awarded the custody of two minor sons who, at the time of the hearing in January 1941, were respectively four and a half and three years of age. Respondents, the mother and maternal grandmother, have appealed.

The facts are virtually undisputed. The parents were married August 7, 1935, and lived in Scranton until about 1937, when they moved to Indiana, Pennsylvania, where relator took a position as greenkeeper at the Indiana Country Club. He received a salary of $150 per month; the family lived in a farmhouse on the club property which was furnished to him, and, in addition to his salary, he received normal utilities' services; at the time of hearing he was also acting as manager of the grill room and was furnished his meals. The relationship between the parents was apparently a happy one until the spring of 1940. At that time the wife became actively engaged in the work of a religious sect known as Jehovah's Witnesses. This was the principal, if not the only, cause of their differences. Her activities consisted of going from house to house urging people to listen to a bible lecture played on a victrola and distributing literature. She wanted her husband to agree to permit her to hold "study" groups or meetings in their home, which he refused to do. Although there was nothing to indicate that she was not capable of performing all of the household duties, she apparently wanted the husband to furnish her with a maid so that she could devote more time to her religious activities. She testified that, "He tried to force me to go to church with him, and I refused to do it." She said, "He talked terribly to me, all because of the fact that I believed the way I did. He said if you give

up that rotten, dirty belief, he says I'll do anything for you, but that I refused to do." In March 1940, she left the home and took the children with her to Scranton to live with her mother and stepfather where she could continue her religious activities unmolested. She remained away until the first of July, when, at the request of the husband, who agreed to tolerate her beliefs provided she kept them to herself, she returned. The family lived together until October 17, when the wife again removed the children to Scranton. She said she intended this separation to be permanent and when asked, "Would you consider going back to your husband in Indiana?" said, "No, I could never think of that." There is no denial that the husband had been, and was at the hearing, willing to take her back with the children at any time.

It is important to bear in mind that: "It is useless to argue about the rights of this mother or father under the (marriage) contract; neither has any right thereunder which is involved in the issue here arising. The paramount issue ...... is the best interest and permanent welfare of the child(ren)." CUNNINGHAM, J., in *In Re: Custody of Minor Children of Rosenthal,* 103 Pa. Superior Ct. 27, 33, 157 A. 342. And it is not our province to attempt to weigh and determine the merits of the particular religious faith which the wife espoused as compared to the religious faith of the husband, who was a Methodist, or of any other.

There are certain practical considerations. After their removal to Scranton, the children, with the wife, together with her mother and stepfather, were living in a home in which there were but two bedrooms. This meant that the wife and the two children slept in one room, or, as suggested in the cross-examination of a witness called by respondents, one of the children slept in the room with the grandparents. Neither the wife nor grandmother worked and the sole source of income of the household consisted of the earnings of the wife's

stepfather, who was a W.P.A. worker. If the custody of the children were awarded to the wife, she would, of course, be entitled to receive from the husband some contribution for their support. But the difficulty here is that a substantial part of the husband's salary consists of living quarters, meals and other emoluments which it is impossible for him to pass on. It was suggested to him on cross-examination that he could pay $60 a month, which would be a little less than half the part of his salary paid in money. He said he would be unable to do this because of certain demands on him which were not explained, but even if he could, that sum would not enable the wife to maintain a separate home for the children comparable to the one the husband would be in a position to furnish if they lived with him, and it scarcely needs argument to prove the lack of economic security in their present establishment.

But there is perhaps a more substantial reason for our conclusion to affirm the order. It is admirably expressed by the learned court below as follows: "...... Counsel for the respondent vigorously argues that, pursuant to its duty to determine what is for the best interest of the children and award their custody accordingly, the court should apply the usual rule that children of tender age are entitled to remain in the custody of their mother, in the absence of a showing that she is an unfit person to care for them. From a standpoint of ability to furnish maternal care and the existence of normal maternal love, it must be conceded that the mother is not in any sense an unfit person to care for these children. But we cannot escape the conclusion that she regards the observance of her obligations to her denomination and the furthering of its interests as superior to her obligation to care for her children. From her own testimony it is quite apparent that she devotes as much of her time as is possible to the proselytizing work of her religion and

leaves the care of her children for many portions of each day to her mother.  We also think that the legal fitness of the respondent to care for her children may be seriously questioned when we consider that the children must of necessity be raised in an atmosphere which condones the deliberate break-up of a family because of one spouse's idea of a superior way of life."

The order is affirmed.

RHODES, J., dissents.