[No. 7864–0–I. Division One. November 3, 1980.]

*In the Matter of the Marriage of* JUDITH NELL HADEEN, *Appellant, and* GLEN IVEN HADEEN, *Respondent.*

*Bertha R. S. Houser,* for appellant.

*Voris, Belcher, Swanson & Lackey* and *Chester T. Lackey,* for respondent.

CALLOW, C.J.—Judith N. Hadeen, petitioner below in a suit for the dissolution of her marriage to Glen I. Hadeen, appeals from the trial court's award of custody of four of the Hadeens' five daughters to Mr. Hadeen. The trial court awarded Mr. Hadeen custody of Lisa, age 15, Lynn, age 13, Lila, age 11, and LaVon, age 8. Mrs. Hadeen was awarded custody of the Hadeens' oldest daughter, Lori, age 17. This

appeal presents the issues of whether religious acts may constitute a determinative factor in an award of custody, and, if so, what test must be used to protect the interests of children and the religious freedom of parents.

In the fall of 1977, a person who had previously been the Hadeens' minister returned from Canada and activated a Bellingham branch of the First Community Churches of America. The First Community Church is a fundamentalist Christian sect which demands much of its members' time, their total loyalty, and a subservience to the teachings of the church. The church teaches a strict code of discipline as a means of gaining parental control of children. Mrs. Hadeen admitted that on one occasion she had her other children hold her daughter Lisa while she spanked her with a ping–pong paddle for 2 hours. Mrs. Hadeen testified that usually only a few spankings were necessary. It is unclear whether Mr. Hadeen sanctioned Mrs. Hadeen's disciplinary practices. Witnesses testified that the church teaches enforced isolation and fasting as another means of discipline. The church also teaches that there are essentially two classes of people: "natural people" and "spirit filled people" who have repented, been baptized and received the Holy Spirit. There was testimony that children were taught to use foul language when speaking to other children who were "natural people," and that there was nothing wrong with lying to "natural people." Mrs. Hadeen denied that church members were taught not to associate with "natural" people.

A few months before the separation of the parties in 1978, there was a split in the church. Mr. Hadeen went with the group that left the church while Mrs. Hadeen stayed. There is little testimony as to what precipitated this split. According to Mr. Hadeen, in February of 1978 the pastor of the church unsuccessfully attempted to get Mr. Hadeen to sell the family home and give the proceeds to the ministry. Mr. Hadeen testified that his relationship with his wife deteriorated rapidly as a result of an incident occurring on Memorial Day of 1978. At that time, he and his wife had

decided to paint the couple's house, but the pastor came over and said that they should not paint the house and that they were to go to a meeting in Seattle. Mr. Hadeen refused to go, but his wife argued that they should obey the pastor.

Mrs. Hadeen testified that she would allow Mr. Hadeen visitation if she were given custody of the children. She testified that she did not want custody of Lisa at that time unless "she is ready to live right and walk right with the Lord." Although their pastor had moved to Portland, there was a First Community Church in Seattle that Mrs. Hadeen would attend.

Mr. Hadeen testified that the church exercised control over its members to whatever extent possible. He said that he never treated his children violently, but had slapped and kicked Mrs. Hadeen in the children's presence following their separation. He did so, he testified, because on one occasion she would not talk to him and on another she cursed him and began "speaking in tongues."

Mrs. Hadeen's sister–in–law testified that the parties' religion had not had bad effects on the children and that their conduct was exemplary. Others testified similarly. Mr. Hadeen's sister–in–law testified that the church taught parents to spank their children until they stopped scream-ing. She further testified that ex–members were shunned. Another church member testified that ex–members were ostracized, and that some parents beat their children while others did not. According to this witness, the church came before family for Mrs. Hadeen.

The trial court interviewed three of the Hadeens' daughters in chambers. Lori testified that her grades are excellent and that she is active in basketball. She testified that the church did not force her or others to do anything. She said she did not visit her father because of the way he had treated her mother and tried to buy the children's affection. Lisa testified that her mother would not talk to her because she would not go to church. She left her mother because she beat her to force her to go to church. Lynn testified that she was in the seventh grade, played

sports, had high grades, and did not like her father because he tried to bribe her.

When the taking of testimony was complete, the trial court appointed a psychiatrist as an independent expert to evaluate (a) the children's interrelationship; (b) the parents' and children's interrelationship; (c) whether the children had personality problems; and (d) the problems, effects and desirability of split custody.[1]

---

[1]The psychiatrist's report to the court provides in part as follows:

"By the history that I was able to obtain both from Mr. and Mrs. Hadeen, their relationship and marriage was probably adequate until approximately one year ago. It was at that time that Mr. Hadeen began rejecting some of the principles of the fundamentalistic religion that he was a part of at that time, and Mrs. Hadeen continued to endorse them. Because of the nature of the religion and the intensity of the involvement required by the church, this is not a type of religion that will easily tolerate that kind of split in a family. The result is either you endorse the religion and the person's identity in it, or if you reject the religion it is as if you are rejecting the person that endorses the religion. For the marriage partener [sic] that is not involved with the religion, the requirements of the church are such that they are more involved with the church and its activities, than they are with the family constellation that is outside the church. This usually and in this case, has led to rejection of that religion as an alternative to the outside marriage partener [sic]. The intensity of conflict between the involved individuals in cases like this are very severe and uncompromising. This puts the involved children caught between an uncompromising parent grouping into an extreme amount of stress, unless they totally accept one side or the other side of this religious conflict and end up rejecting the other parent. In the limited amount of time that I have had with this family, I would say that the relationship with the individual parents and with the individual children prio [sic] to the religious conflict, was probably adequate. Additionally, it would be my impression that mother was probably the primary care giver and had more involvement with the children than father. This fits within the normal practice of Anglo–American society, both parents being supportive to each other in their respective roles worked adequately, but when the split–up came the children were confronted with stress. It is my impression that, Mrs. Hadeen provides the children with an adequate parenting situation with the knowledge of the severe limitations brought on by her involvement with the authoritarian, ultra fundamentalistic Christian group that she is affiliated with, and how this involvement will ultimately result in the children being more and more isolated from familial and community involvement, as they become older and deeply affiliated with this religious group. It is my impression after having spent time with the children that, at this time all the children are stating that they want to live with their mother. The children's relationship with their father has been quite adequate until such time as conflict was brought into this by his denouncing attachment to the First Community Church of America. Since the children are quite tightly attached to their mother and her

Two and one–half months after the first hearing, another hearing was held. Mrs. Hadeen testified that she and the

---

religious convictions this brought a real area of stress into their relationship with Dad, and it has been solved separately by each individual child. Lori, seventeen years of age, has basically resolved it by accepting Mom, identifying with her and understanding things from Mom's perspective and thus rejecting Father. Her statement was, 'I have nothing in common with Dad since he has left the Church.' Lisa, fifteen years old, at the beginning of this psychiatric evaluation was living with father and her grandparents. Subsequently has expressed a strong desire to move in with mother and basically has not resolved the conflict that this split has presented her with. She ambivalently finds that she wants to live at one time with one parent and at another time with the other parent, and while living with any parent singly is unable to explore the positive or negative nature of living with such individualized parent. She exhibited her stress of conflict with a variety of acting out behaviors. It was very clear in her statement, 'I'm tired of being caught between Mom and Dad.' Lynn, thirteen years old, states that, 'I would prefer to live with Mother.' Over the last couple of months she has exhibited certain behaviors that show her ambivalence. The one behavior is a rejective behavior in terms of not showing up for normal visitation and the other behavior is being angry at Dad for trying to be overly nice and trying to buy hers and the other children's friendship. She states that, 'I would like it if Dad would quit doing that and I would be more comfortable around him.' Thus exhibiting some attachment behavior. She states that, 'People in the past have felt that Mom has been forcing me in terms of my feelings about Dad, but I don't believe this to be true.' It is my clinical impression that she too, is basically a girl in conflict; but at this time is beginning to identify more and more with mother and rejecting father because of the need for total committment [sic] both to her church and to her mother, and because she is angry at her father's solicitous behavior. Lilla [sic], eleven years of age, states that, 'I would probably like to live with mother.' But it is very obvious that she still has feelings about her father and likes to interact with him on the appointed weekends. She too, is angry at the solicitous behavior on father's part and wants Dad not to try to buy their friendship. Lavon [sic], eight years of age, is unable to verbally express any desire about living and/or talk about the conflict that she feels being caught between mother and dad. It would be my immpression [sic] that she is well attached to mother because she is functioning without a lot of regressive behavior. But additionally I feel that, she is moderately attached to Dad and this would fit into the context of being younger and having stronger familial attachments than religious attachments. She seems adequately happy to visit dad on visitation weekends, both she and Lilla [sic] at times react in a manner quite appropriate for children that have strong attachments to their paternal parenting figures.

"It is my impression that these children are very strongly attached to each other as long as they can basically be in agreement around the religious issue. If one of these children steps out of line on a religious issue she will be ostracized by the older children and thus either be rejected and/or brought back into line with the religious thinking. The child that steps out of line, such as Lisa has in the past, is then faced with being a part of the family or being rejected by the family.

children had moved to Seattle where the children enrolled in school and she became employed. She testified that the move was made so she could get a job. According to her testimony, Lynn refused to visit her father, but she told her to visit him. As to Lisa, Mrs. Hadeen testified that she just wanted Lisa to abide by the rules by telling her where she is going and by being home at night. Mrs. Hadeen testified that she would not force the church on Lisa and would accept her back. Both parties agreed that there were and had been major disciplinary problems with Lisa, and that she was having emotional difficulties, was doing poorly in school, and was involved with alcohol and drugs. Mr. Hadeen testified that Mrs. Hadeen would not see Lisa, according to Lisa, until she got her bad spirits out. Mrs. Hadeen testified in rebuttal that she had never said anything to Lisa about bad spirits and that she wanted Lisa to visit her.

The trial court stated in its oral opinion:

> The tenets of the church are not something the Court wants to spend a great deal of time with, primarily because religion, religious issues and conditions, I think, are those that fall peculiarly within the conscience and conviction of people who follow the dictates of their own

---

This leaves the child quite conflicted and under stress, but does not necessarily sever ties that she has with her sisters. At the time of this dictation, Lisa is again comfortable being back in the maternal sibling side of the family unit and is willing to accept the religious teachings of her mother and decrease her need for autonomous ways of thinking and acting. It is my impression that, these children are very tightly attached to each other and if in the future one of these children can not accept the religious cohesiveness that ties this family together, they will be rejected and they too will reject their siblings, because the religious ties and familial ties have become one.

". . .

"It is probably in the children's best interest to maintain contact with their father, if this can be done without mother and father having open, hostile fighting. I have discussed this with both parents. If the children are uncomfortable with visitation for what ever reasons, I think that is important for the adults involved to understand that this is probably the children's response to the environment and identification and it would not be in their best interest to be forced to visit either parenting figure."

beliefs and conscience. The Court is not concerned particularly with the tenets of this church, other than as it may affect the children. And in that regard, it does appear to be a denomination that requires complete submission and fidelity to the exclusion of other reasonable relationships that usually exist.

Based on the records before it, the trial court entered the following findings of fact respecting custody:

a) That the four youngest children of the parties maintain strong emotional bonds with both parents.

b) That the Petitioner provides proper physical care for the children.

c) That the children are reasonably well adjusted with the exception of Lisa who is having difficulties adjusting to the dissolution.

d) That both of the parties were members at one time in the First Community Churchs [sic] of America. The Respondent has subsequently removed himself from the church.

e) That the Petitioner, Judith Hadeen, is in complete submission to the First Community Church of America, to the exclusion of other reasonable relationships.

f) That the Petitioners first fidelity is to the church, as is evidences [sic] by the Petitioner's rejection of the parties' minor child Lisa, and as evidenced by the Petitioner's move to Seattle with only a short time remaining in school and the subsequent move made in Seattle, all of which are not in the best interest of the parties' minor children.

g) That [the psychiatrist] recommends the children's custody be with the Petitioner, provided the problems caused by the Petitioner's religious involvement with the First Community Churches of America are satisfactorily resolved.

h) To award custody to the Petitioner, Judith Hadeen, would effectively cut Glen Hadeen off from his involvement with the children, and that the children need to have continued contact with both parents. That Lori Hadeen, the oldest of the parties' minor children, is deeply involved with the First community Church of America, and she had close associations with her mother and the church. Because of her age Lori should be placed in the custody of her mother.

i) The best interest of the parties' other minor children is served by placing those children in the custody of the Respondent, Glen Hadeen, subject to reasonable rights of visitation for the Petitioner.

Mrs. Hadeen assigns error to the last five of the findings and contends that the custody award constitutes a manifest abuse of discretion. She concedes that the best interests and welfare of the children are the primary and controlling considerations in custody matters, but argues that the trial court curtailed her First Amendment right freely to exercise her religion because the custody award was not made upon a clear and affirmative showing that her religion adversely affects the welfare of the children. She argues that the evidence does not support the finding that she is in complete submission to the church and that the court's consideration of her religion as an integral part of its decision constituted an abuse of discretion. She argues that there is no evidence to support the finding that an award to her would cut off Mr. Hadeen from his involvement with the children, but that even if this were true, this finding provides no basis for the trial court's order, citing *Quiner v. Quiner,* 59 Cal. Rptr. 503 (Cal. App. 1967).

■ The best interests and welfare of the children are paramount in custody matters. RCW 26.09.190; *Munoz v. Munoz,* 79 Wn.2d 810, 812, 489 P.2d 1133 (1971). The trial court must consider all relevant factors, including the parents' and children's wishes; the interrelationship of the children with their parents and others who may affect their best interests; the child's adjustment to his or her home, school, and community; and the mental and physical health of all concerned. RCW 26.09.190. We assume that the trial court discharged its duty and considered all evidence before it relating to these factors. *In re Marriage of Croley,* 91 Wn.2d 288, 291, 588 P.2d 738 (1978). Whether the trial court considered and premised its decision upon considerations violative of the First Amendment's provision respecting religion requires our consideration of the principles

used in determining the scope and application of the First Amendment's provision respecting religion.

■ The First Amendment provides in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." This clause applies through the Fourteenth Amendment to the states, *Cantwell v. Connecticut,* 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940), including the states' judiciary, *see Shelley v. Kraemer,* 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836, 3 A.L.R.2d 441 (1948). The dual nature of the First Amendment's provision respecting religion encompasses the establishment clause, which guarantees government neutrality in matters touching upon religion, and the free exercise clause, which recognizes the individual's liberty in religious matters. The overall purpose respecting freedom of religion is to insure that no religion is advanced or favored, commanded or inhibited. *Walz v. Tax Comm'n,* 397 U.S. 664, 25 L. Ed. 2d 697, 90 S. Ct. 1409 (1970). As regards the free exercise clause, "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Wisconsin v. Yoder,* 406 U.S. 205, 220, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972). While the freedom to believe is absolute, the freedom to act is subject to regulation for society's protection, *Cantwell v. Connecticut, supra* at 303–04, but even then "'[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation,' . . ." (Citation omitted.) *Sherbert v. Verner,* 374 U.S. 398, 406, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963).

*Wisconsin v. Yoder, supra,* considered whether compulsory school attendance laws past the eighth grade violated the right of Amish parents to exercise their religious beliefs. Noting that parents have the right to direct the religious upbringing of their children, *Wisconsin v. Yoder, supra* at 233–34 (citing *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 69 L. Ed. 1070, 45 S. Ct. 571, 39 A.L.R. 468 (1925)), added:

To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* [*v. Massachusetts,* 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (1944)] if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.

This must be read in light of the court's admonition that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder, supra* at 215. The court held that Amish parents could not be penalized for a violation of the compulsory attendance laws, but noted that the case before it was not a case in which "any harm to the physical or mental health of the child . . . has been demonstrated or may be properly inferred." *Wisconsin v. Yoder, supra* at 230.

Cases involving religion as an aspect of a custody dispute generally comport with the language of *Wisconsin v. Yoder, supra* at 233–34, regarding a showing that the parental decisions will jeopardize the child's health or safety. The showing that must be made and the test involved in the determination of when the jeopardy must arise are, however, subject to significant dispute.

In *Stone v. Stone,* 16 Wn.2d 315, 133 P.2d 526 (1943), the question was whether the trial court had deprived a mother of the control and custody of her children solely because the trial court believed that the teachings of the Jehovah's Witnesses rendered the mother unfit to have care and control of the children. The opinion observed that although the mother devoted 6 hours a week to distributing religious literature, that did not appear to result in her neglecting her home or family. The children attended school and had above average grades. The court could not find that the mother was unfit to have custody of the children because of her religious beliefs. *Stone v. Stone, supra* at 322. The court stated that the fact that Jehovah's Witnesses would not salute the flag could not be relied upon as

a factor in the trial court's award of custody. *Accord, Smith v. Smith,* 90 Ariz. 190, 367 P.2d 230 (1961).

In *Quiner v. Quiner,* 59 Cal. Rptr. 503 (Cal. App. 1967), the mother belonged to the Plymouth Brethren Church and embraced its doctrine of "separation," which maintains that church members shall have no fellowship or association with nonchurch members and shall completely avoid radio, television, movies and theater. The mother attended church meetings six times a week, each meeting lasting 1 1/4 hours. Children were brought up to view any outsiders as "unclean." A schism in Mr. and Mrs. Quiners' fellowship developed over the doctrine of "separation." The husband went with one branch of the church while the mother went with the other. Following a hearing on the dissolution of the parties' marriage, the trial court found both parents to be of good character and able to care for the child's physical needs. The trial court awarded custody of the child to the husband on the basis of the court's finding that the child's mental welfare and opportunities for intellectual character and personality growth would be furthered best with the father. The trial court further found that the mother considered it her duty to inculcate the child on the basis of separation, and that her religious devotions were more important to her than her son and husband.

On the mother's appeal in *Quiner,* the court noted that the best interests of the child is the paramount consideration in a custody dispute and that, by statute, a mother is to be awarded custody of a child of tender years, all other things being equal. *Quiner v. Quiner, supra* at 509. The mother argued that she had been penalized for her religious beliefs by denying her the custody of her child. There was no evidence or finding that the child, 2 1/2 years old, regarded his father as unclean or did not love him, or that the principles of separation "had actually taken place and had impaired the physical, emotional and mental health and well–being of the child." *Quiner v. Quiner, supra* at 511. The court stated that "the reasons assigned are inextricably a part and parcel of religious belief and that a

judgment so bottomed cannot withstand constitutional attack." *Quiner v. Quiner, supra* at 513.[2] The dissent stated that the majority's requirement of evidence of

---

[2]The *Quiner* court stated:

"Even assuming 'physical well–being' includes mental and emotional well–being, knowledgeable as we think we are with the teachings of psychology and psychiatry, we are of the opinion that courts have no power to tell parents who teach nothing secularly immoral, unlawful or against public policy, how to shape the minds of their children, particularly on the subject of accepted religious belief. Evidence must be produced which will sustain a finding that there is actual impairment of physical, emotional and mental well–being contrary to the best interests of the child. We cannot proscribe the doctrine of separation, as taught by the Brethren, because, although it is admittedly a spiritual doctrine, temporal effects may cause deviation from the accepted norm.

". . .

"Although evidence at bench indicates that if John Edward is raised with emphasis on the principle of separation the probabilities are that he will not grow up in accordance with what is generally considered the norm, it does not follow that the best interests of the child would be served by awarding custody to the father.

"Precisely because a court cannot *know* one way or another, with any degree of certainty, the proper or sure road to personal security and happiness or to religious salvation, which latter to untold millions is their primary and ultimate best interest, evaluation of religious teaching and training and its projected as distinguished from immediate effect (psychologists and psychiatrists to the contrary notwithstanding) upon the physical, mental and emotional well–being of a child, must be forcibly kept from judicial determinations. Numerous profound thinkers have fixed convictions that *all* religion is bad, particularly so in the rearing of children. If a court has the right to weigh the religious beliefs or lack of them of one parent against those of the other, for the purpose of making the precise conclusion as to which one is for the best interests of a child, we open a Pandora's box which can never be closed. By their very nature religious evaluations are subject to question, disbelief, and difference of opinion. . . .

". . .

"There is no showing at bench . . . that any acts of appellant, (other than her admission that the child is and will be taught the doctrine of separation), has in any way diminished his affection and devotion to his father. There is no evidence, and indeed it may have been too early to accumulate any evidence, that the doctrine of separation had in any manner affected the child's physical, emotional or mental well–being. Although the evidence indicates a probability of psychological impact, we doubt that we can ignore inferences to the contrary, and anticipate on the basis of psychiatric conclusion alone that a child's attitude toward his father will assume an inimicable or hostile complexion, or that his physical, emotional or mental health will be affected. The fact that judged by the common norm, it may be logically concluded that custody in the father is for the child's best interests, does not warrant us in taking custody away from the mother when such an order

*"actual impairment* of physical, emotional and mental well–being contrary to the best interests of the child" was a test totally ignoring the best interests of the child. *Quiner v. Quiner, supra* at 519 (Herndon, J., dissenting).[3]

 We glean from these cases that religious decisions and acts may be considered in a custody decision only to the extent that those decisions or acts will jeopardize the temporal mental health or physical safety of the child. The question remains whether jeopardy to a child must be one of actual present impairment of the child's physical and/or mental well–being or a reasonable and substantial likelihood of impairment. We conclude that the *Quiner* requirement of *actual* impairment is improvident and could lead a trial court to ignore a child's present welfare. We hold that the requirement of a reasonable and substantial likelihood of immediate or future impairment best accommodates the general welfare of the child and the free exercise of religion by the parents. *See Morris v. Morris,* ___ Pa. Super. Ct. ___, ___, 412 A.2d 139, 146–47 (1979).

---

must be bottomed on our opinion that the mother's religious beliefs and teachings, in their effect on the child, are and will continue to be contrary to the child's best interests.

"If it be shown at any time in the future that appellant, contrary to established legal principles and proper injunctive order, is teaching John Edward not to love and respect his father, such direct indoctrination would undoubtedly require the application of sanctions. Further, if, as a consequence of the teaching of the principle of separation to the child, it be shown that John Edward's physical, emotional and mental well–being has been affected and jeopardized, or that appellant is acting contrary to court order, illegally, neglectfully or immorally, even though appellant's conduct may be impelled by her religious beliefs, irrespective of how sincere they are, the courts of our state are open forums to which the father has ready access for relief." *Quiner v. Quiner, supra* at 516–18. *Accord, Osier v. Osier,* 410 A.2d 1027 (Me. 1980).

[3]Supportive of the dissenting view in *Quiner* is *Welker v. Welker,* 24 Wis. 2d 570, 576, 129 N.W.2d 134, 138 (1964), where the court stated that a parent might be denied custody if he or she holds views that "might reasonably be considered dangerous to the child's health or morals". *See also Commonwealth ex rel. Derr v. Derr,* 148 Pa. Super. Ct. 511, 25 A.2d 769, *cert. denied,* 317 U.S. 631, 87 L. Ed. 509, 63 S. Ct. 57 (1942); *Clift v. Clift,* 346 So. 2d 429 (Ala. Civ. App. 1977); *Stapley v. Stapley,* 15 Ariz. App. 64, 485 P.2d 1181 (1971).

The trial court's finding that Mrs. Hadeen is in complete submission to the church to the exclusion of other "reasonable" relationships is a subjective conclusion which should have played no part in the trial court's decision unless Mrs. Hadeen's submission posed a substantial threat of endangering the children's mental or physical welfare. There was no evidence that Mrs. Hadeen neglected her children or did not provide them with her companionship because of her membership in the church. In fact, the trial court expressly found that the children were adjusted reasonably well.

Also unsupported by substantial evidence is the finding that the psychiatrist's recommendation of custody being with the mother was conditioned upon the mother's resolution of her involvement with the church. The psychiatrist stated that it was in the children's best interests to maintain contact with the father if that could be done without having the mother and father fight. He recommended that if the children were uncomfortable with visitation, then it would be in their best interests not to be forced to visit either parent.

There is substantial evidence to support the finding that Mrs. Hadeen's first fidelity is to the church, even to the extent of rejecting her children. The psychiatrist reported that Lisa was under a great deal of stress partially attributable to her mother's rejection of her, and he reported that Lisa might need treatment if her mother rejects her again. Due to the close attachment the children have for each other, the rejection of one child by the mother in the name of religion must impose a heavy burden on the other children's emotional well–being. The trial court properly relied upon its finding regarding the mother's rejective behavior. Also supported by substantial evidence is the finding that the children effectively would be cut off from Mr. Hadeen if Mrs. Hadeen were awarded custody. As stated in *Brock v. Brock,* 123 Wash. 450, 452, 212 P. 550 (1923), "to deny to the child an opportunity to know, associate with, love and be loved by either parent, may be a more serious ill than to refuse it in some part those things

which money can buy." *Accord, Delle v. Delle,* 112 Wash. 512, 192 P. 966, 193 P. 569 (1920). Visitation nevertheless remains but one consideration in making the decision of what is in the best interests of the child's welfare. *Joslin v. Joslin,* 45 Wn.2d 357, 364, 274 P.2d 847 (1954); *Borenback v. Borenback,* 34 Wn.2d 172, 178, 208 P.2d 635 (1949). Substantial evidence supports the finding that the children need to have continued contact with both parents. The trial court was of the opinion that this was in the children's best interests. The psychiatrist recommended that LaVon and Lisa particularly needed contact with their father to further their development, and it may be inferred therefrom that to sever the children's emotional ties to their father would present a reasonable and substantial likelihood of impairing their mental well–being.

There are many conflicting elements present which will pull a trial judge in opposite directions in deciding where to place custody. As we read the record and the findings, it is likely that a determining factor here was the mother's involvement with her church. Since the trial court did not find that the church membership of the mother posed a threat to the mental or physical welfare of the children, it would be improper to consider the religious involvement of the mother as an ingredient in the decision as to the award of custody. *See Munoz v. Munoz,* 79 Wn.2d 810, 814, 489 P.2d 1133 (1971). The cause is remanded to the trial court for retrial of the issue of custody consistent with the guidelines expressed herein.

In view of our remand of the issue of custody, the award of the furniture and family home is also remanded to the trial court for reconsideration, since the award of these items was intertwined inextricably with the award of custody.

Finally, both parties argue that they should be allowed attorney's fees on appeal pursuant to RCW 26.09.140. The award of attorney's fees shall abide the final disposition of the cause.

Reversed and remanded.

RINGOLD, J., concurs.

DORE, J. (dissenting)—I would have affirmed the custody award of the trial court (a) giving custody of the minor daughters, Lisa, age 15, Lynn, age 13, Lila, age 11, and LaVon, age 8, to the father subject to liberal visitations by the mother, and (b) giving the custody of Lori, age 17, to the mother. I also would affirm the property division vesting the home in the father in order that he could care for the children, and giving the mother a lien for her community interest in such property.

The issues involved here are (1) whether the court's findings of fact are supported by substantial evidence, and (2) whether the order of custody to the father, Glen Hadeen, is arbitrary and capricious.

It is well established law that findings of fact which are assigned as error will not be disturbed if they are supported by substantial evidence. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

The following finding of fact is at issue on this appeal:

f) That the Petitioners first fidelity is to the church, as is evidences [*sic*] by the Petitioner's rejection of the parties' minor child Lisa, and as evidenced by the Petitioner's move to Seattle with only a short time remaining in school and the subsequent move made in Seattle, all of which are not in the best interest of the parties' minor children.

g) That [the psychiatrist] recommends the children's custody be with the Petitioner, provided the problems caused by the Petitioner's religious involvement with the First Community Churches of America are satisfactorily resolved.

h) To award custody to the Petitioner, Judith Hadeen, would effectively cut Glen Hadeen off from his involvement with the children, and that the children need to have continued contact with both parents. That Lori Hadeen, the oldest of the parties' minor children, is deeply involved with the First Community Church of America, and she had close associations with her mother

and the church. Because of her age Lori should be placed in the custody of her mother.

i) The best interest of the parties' other minor children is served by placing those children in the custody of the Respondent, Glen Hadeen, subject to reasonable rights of visitation for the Petitioner.

Finding of fact No. 7.

A review of the record conclusively shows there is substantial evidence upon which the trial court based the above finding of fact. In the record we find continuous and numerous outrageous incidents perpetuated by the petitioner mother upon her children over a long period of time. Some of these are:

1. She believes that "children overriding parents is witchcraft." In order to avoid and negate the witchcraft, Mrs. Hadeen admitted that she sent the children to the bedroom to fast. She stated that she did this with her children in order to make them obedient and they did not rebel as a result of it. However, she did state

> They do not rebell [sic] but Lisa did rebell [sic] and this rebellion, which is witchcraft, it really is witchcraft, what it does, it comes against, I have seen it even cause sickness in homes if a child is rebelling or, say, one person in the home is rebelling. It can just cause, you know, cause all sorts of things to enter in that you don't want there. What we want is to keep the peace of God in our homes and to keep the children obeying us and being in submission to us.

2. Mrs. Hadeen admitted that the church teaches that you are to "spank until the will is broken—spank through the loud bellering, until they cry softly." She described paddling her daughter Lisa for 2 hours in the following language:

Q Okay. Do you recall an incident with Lisa, now I think you just referred to it possibly as a spanking?

A Uh–huh.

Q Did that spanking consist of having the girls hold her down and beat her with a rod for two hours?

A Yes, yes, I sure did, because that kid, she would not let me do it, she would fight it and so I had the girls hold

her and I spanked her to where she felt it. You bet I did.

This was a *beating* of Lisa by the mother, not a spanking, and is an example of an outrageous child abuse.

Inez Hadeen, Glen's sister–in–law, testified that she was formerly a member of the First Community Church of Bellingham. They were taught by the church:

There's nothing wrong to lying to somebody because they aren't going to believe the truth anyway. This is the word from Bob Taylor's mouth. He said you're, they will not believe the truth anyway so, therefore, lie to them.

Q Okay. How about specifically like to school authorities?

A To school authorities, to somebody you work for, teachers, people that you come in contact with every day.

Q This is *taught to the children*?

A *Yes, it is, and they're also taught to use the foulest language they want to to other children in the school because that is fine because that's the only language that other children understand.*

Q By foul language, what do you mean?

A *I mean the rotten four–letter words that most people object to.* I heard it with my own ears and my children have done it too and now my husband and I are in the process of teaching our children different, trying to bring them up with a normal attitude toward life.

. . .

Q Okay. Now, Inez, on the other forms of disciplining, the rod and beating the children until they stopped screaming,—

A Uh–huh.

Q —was that taught to you, was that—

A Definitely, definitely, we were told to use a rod or a paddle to discipline the children with and to *spank them until they quit the loud screaming and quit and spank them until they cried softly.*

. . .

Q . . . Do you know of any children in this church that were beaten, I mean beaten to the point where they needed doctor's care or anything like that?

A Yes.

Lois Green, a friend of 6 years, testified as to the fact that the church comes first before children and husband. She stated that Mrs. Hadeen at one time stated:

A She said that, and this was part of the teaching from the church because Babe Lloyd also told this to me many a time and that when we were even to practice this that we would tell to our children, our husbands, whoever, that we were going on with the Lord regardless of them and if they didn't want to go, then they could just go on, whether they had to leave or whatever.

Judith Hadeen admits that it is the teaching of the church that another means of disciplining is to send the children to their rooms with no food or anything until repentance. It was the testimony of Lynn Hadeen that she practiced this method of discipline, and on one occasion Lori was forced to fast for a period of 2 days.

Consistent with the church philosophy, Judith Hadeen has rejected those who are "natural people" (people that are outside the church) and not filled with the spirit. Those include her parents, her daughter, her husband, her husband's parents, and other relatives of her husband. She presently does not speak to her parents, her husband's parents, or her daughter Lisa who has left the church.

In chambers, in discussion with the trial judge, Lisa stated:

She says she [mother] will talk to me when I repent and come back to the church. That is the last thing that she said to me and then she hung up on me.

It is undisputed that Judith Hadeen removed her children from school in Bellingham with 1 month remaining in the school year, and moved to Seattle. She admitted that she did this without even considering leaving the children with her husband so that they might finish the school year in the schools that they had attended all of their lives. The court, in commenting upon taking the children out of school a month before the end of the school year, stated: "I

don't think that shows very good judgment. I don't think that shows a great deal of concern for the children."

Dr. Watson was appointed by the court as an independent expert psychiatrist, to determine the relationship of the children with their mother and father, and to secure his recommendation as to custody. In Dr. Watson's report to the court, he made the following statement:

Mrs. Hadeen provides the children with an adequate parenting situation with the knowledge of the severe limitations brought on by her involvement with the authoritarian ultra fundamentalistic Christian group that she is affiliated with, and how this involvement will ultimately result in the children being more and more isolated from familial and community involvement, as they become older and deeply affiliated with this religious group.

It is clear that Dr. Watson viewed the mother's involvement in the church with the limitation of ability to parent and recognized that problems were caused to the children by her association with the First Community Churches of America.

Dr. Watson reported that to award the custody of the children to petitioner would effectively cut off Glen Hadeen from his involvement with the children. There was testimony in the record that Glen Hadeen was a caring father, with the financial capacity and family support to care for the children, and the court had substantial evidence to support the finding that the children's best interests were served by placing them in the custody of the father. The trial court, in its decision, took into account the many bizarre actions of the mother toward her children in making its decision on the award of custody of the minor children to the father. However, Judith's religion itself was carefully avoided by the trial court, as illustrated by the following language in its oral opinion.

The tenets of the church are not something the Court wants to spend a great deal of time with, primarily because religion, religious issues and conditions, I think, are those that fall peculiarly within the conscience and conviction of people who follow the dictates of their own

beliefs and conscience. The Court is not concerned particularly with the tenets of this church, other than as it may affect the children. And in that regard, it does appear to be a denomination that requires complete submission and fidelity to the exclusion of other reasonable relationships that usually exist.

The trial court made no further reference to the church in its oral opinion nor did it try to restrict the practice of Judith Hadeen's faith in her membership in the First Community Church, nor did it attempt to restrict the attendance of the children at such church services while visiting their mother.

The majority of this court, in remanding the subject case back for retrial on the issue of custody, stated at page 581:

Since the trial court did not find that the church membership of the mother posed a threat to the mental or physical welfare of the children, it would be improper to consider the religious involvement of the mother as an ingredient in the decision as to the award of custody. *See Munoz v. Munoz*, 79 Wn.2d 810, 814, 489 P.2d 1133 (1971). The cause is remanded to the trial court for retrial of the issue of custody consistent with the guidelines expressed herein.

However, *Munoz v. Munoz, supra,* should be of no value to the majority as it can be readily distinguished on the facts from the subject case. In the *Munoz* case, the court entered an order prohibiting the father from taking the children to the Catholic church during visitation. The court stated at page 813:

We recognize the general rule that in child custody cases the trial court, in furtherance of the best interests and welfare of the child, is vested with a wide latitude of discretion and in the absence of a manifest abuse of discretion in awarding the custody and control of minor children, its judgment will not be disturbed on appeal. *Andersen v. Andersen, supra* [75 Wn.2d 779, 453 P.2d 856 (1969)], and cases cited therein. However, where the trial court does not follow the generally established rule of noninterference in religious matters in child custody

cases without an affirmative showing of compelling reasons for such action, we are of the opinion that this is tantamount to a manifest abuse of discretion.

In the instant case, there is no affirmative showing in the record that it would be detrimental to the well–being of the children to allow the defendant to take them to the Catholic Church or to religious instruction in that faith during the periods of his rights of visitation.

However, the trial court in the subject case made no order interfering in the religious matters of the mother, Judith Hadeen, or the children, but only took into account testimony and action of the mother in reference to the children as to whether or not the children would be better off in the custody of the father, rather than the mother.

The testimony in the record, and the court's oral opinion and its findings of fact, lead unmistakably to the conclusion that the court found that the church membership of the mother posed a threat to the mental and physical welfare of the children, and it is unnecessary to remand the case back to the trial court for entry of a finding that has already been established. In addition, such a finding in the subject case is not even necessary.

*In re Marriage of Croley*, 91 Wn.2d 288, 292, 588 P.2d 738 (1978) held that a finding that the mother's religion posed a threat to the mental and physical welfare of the children was in the oral opinion and therefore it would be *unnecessary* to have a specific finding to that effect.

Despite evidence on the statutory factors contained in the testimony, the trial court's consideration thereof reflected in its oral opinion and findings of fact, and the trial court's compliance with CR 52(a)(2)(B), we are invited to hold that RCW 26.09.190 also requires specific findings on each of the factors enumerated therein. Where, as here, the record indicates substantial evidence was presented on the statutory factors thus making them available for consideration by the trial court and for review by an appellate court, *specific findings are not required on each factor.*

(Italics mine.) However, although even if a specific finding was required, it would be unnecessary in the subject case as

the court specifically avoided the religious issue in reaching its decision.

The sole issue in the subject case was whether there was substantial evidence in the record to support the court's award of custody and the answer is simply *yes*. In fact, there was overwhelming evidence in the record to support the court's award of custody of the four minor children of the parties to the husband.

I would have affirmed the trial court.

Reconsideration denied December 30, 1980.

Review denied by Supreme Court March 13, 1981.