WILLIAM B. PETERSEN AND WIFE, PATRICIA T. PETERSEN, APPELLANTS v. PAMELA A. ROGERS AND WILLIAM J. ROWE, APPELLEES

No. 9215DC400

(Filed 7 September 1993)

1. **Parent and Child § 24 (NCI4th); Constitutional Law § 119 (NCI4th)— custody of child—adoption consent revoked—inquiry into religious beliefs of parents—improper**

    The general rule in child custody proceedings is that a limited inquiry into the religious practices of the parties is permissible if such practices may adversely affect the physical or mental health or safety of the child, and if the inquiry is limited to the impact such practices have upon the child. The limited inquiry may touch upon the religious practices of the parties as they relate to the health and safety of the child, but such inquiry may not focus on the general beliefs and doctrines of a religion.

    **Am Jur 2d, Divorce and Separation § 978; Parent and Child §§ 20, 26.**

Religion as factor in child custody and visitation cases. 22 ALR4th 971.

2. **Parent and Child § 24 (NCI4th)— child custody hearing— revocation of consent to adoption—inquiry into religious beliefs—improper**

In a proceeding to determine whether custody of a child should remain with adoptive parents or be placed with biological parents after the mother revoked consent to the adoption, the trial court violated the adoptive parents' right to freedom of religion by inquiring extensively into the theological beliefs held by members of The Way. The trial court permitted testimony which could not have related to the present or possible future effect of the adoptive parents' religious practices on the child and the trial court's findings of fact did not indicate that the adoptive parents' religious practices were having a negative effect on the child. In the absence of such evidence, parties to a child custody dispute should not be placed in a position requiring them to explain or defend their religious beliefs.

Am Jur 2d, Divorce and Separation § 978; Parent and Child §§ 20, 26.

Religion as factor in child custody and visitation cases. 22 ALR4th 971.

Appeal by plaintiffs from order entered 11 December 1991 by Judge Patricia S. Hunt in Orange County District Court. Heard in the Court of Appeals 4 March 1993.

*Fisher & Hassell, by Robert A. Hassell and C. Douglas Fisher, for plaintiffs-appellants.*

*Levine, Stewart & Davis, by Donna Ambler Davis, for defendants-appellees.*

LEWIS, Judge.

The main issue involved in this case is the permissible extent of inquiry into religious practices and beliefs of the parties in a child custody proceeding. In this case the trial court allowed an extensive inquiry into the religion of plaintiffs, William and Patricia Petersen. The Petersens appeal from the trial court's order im-

mediately transferring custody of Paul, the minor child in question, to defendants, Pamela Rogers and William Rowe. We now reverse, finding that the court's inquiry violated the Petersens' constitutionally guaranteed right to religious freedom.

A review of the unique background of this matter is essential to an understanding of the case. Pamela Rogers became pregnant with Paul in December 1987 while living with William Rowe in Michigan. While pregnant, Rogers became friends with a member of a religious organization known as The Way International (hereafter "The Way") and began to contemplate giving up the baby for adoption. William and Patricia Petersen, who live in North Carolina, heard about the possible adoption through their membership in The Way, and hired attorney and Way member Doug Hargrave to represent them. When Rogers was six months pregnant Hargrave and the Petersens arranged for her to move to North Carolina and live with a fellow member of The Way. The Petersens and Hargrave provided for Rogers' care and medical needs while in North Carolina. Paul was born at North Carolina Memorial Hospital on 9 September 1988. After the birth Rogers signed a release form and Paul was given to the Petersens. Soon after returning to Michigan Rogers revoked her consent to the adoption, and after extensive litigation the North Carolina Supreme Court vacated the adoption proceeding. *In the Matter of the Adoption of P.E.P.*, 329 N.C. 692, 407 S.E.2d 505 (1991). The Supreme Court remanded the case to the trial court to determine whether custody should remain with the Petersens or be transferred to Paul's biological parents, Rogers and Rowe. *Id.*

Accordingly, the Petersens filed a complaint seeking custody in September 1991. Rogers and Rowe filed responsive pleadings, and the case went to trial in Orange County District Court in November 1991. On 15 November 1991 the court denied the Petersens' request for custody and ordered Paul to be transferred immediately to his biological parents.

In their appeal the Petersens' allege, among other things, constitutional violations arising from the extensive inquiry into the practices and beliefs of their religion at trial. They claim the court impermissibly considered their religious beliefs in reaching its decision to return custody of Paul to his biological parents. They also object to the court's refusal to allow them visitation with Paul, alleging that this decision, too, rested on religious considerations.

PETERSEN v. ROGERS

[111 N.C. App. 712 (1993)]

The Petersens claim the constitutional violations entitle them to a new trial. In the alternative, they claim they are at least entitled to remand for proper determination of their visitation rights.

I.   Facts relevant to this appeal

A.   Evidence admitted at trial

At a hearing on plaintiffs' motion in limine regarding The Way, Judge Hunt refused to prohibit testimony about the general beliefs and practices of The Way, explaining that she didn't know anything about it and it would be unfair to Ms. Rogers to exclude such evidence. She also believed that it would be unfair to the Petersens "not to understand what The Way is all about." In the event of testimony regarding The Way, the judge ordered "additional testimony from the Petersens themselves as to their particularized beliefs." At trial Rogers and Rowe presented evidence about The Way through the testimony of Cynthia S. Kisser, Executive Director of the Cult Awareness Network in Chicago. In compliance with the court's order, the Petersens then presented the testimony of a Way minister, William C. Greene. The testimony of these two witnesses spans 147 pages of the transcript, and involves in-depth examination of the general beliefs, tenets, and practices of members of The Way.

Among other things, Ms. Kisser testified that the group did not follow "traditional Christian beliefs" because its members do not believe Jesus Christ is divine. Furthermore, she explained that The Way's concept of the Trinity is "heresy" and an "heretical position" from the traditional Christian perspective. She described their practice of speaking in tongues as "classic hypnosis," and an "altered state of consciousness." Ms. Kisser testified that in her expert opinion The Way International is a "destructive cult," because of its "unethical" and "deceptive" method of recruiting.

On direct examination Reverend Greene explained some of the allegedly destructive practices of The Way described earlier by Ms. Kisser. On cross examination the court permitted questions regarding his beliefs concerning Jesus Christ, his tithing practices, speaking in tongues, and his belief in devil spirits. The court permitted counsel to question Reverend Greene as to whether The Way is "recognized as a religious denomination in the United States." Counsel then pointed out that The Way is not listed in the Handbook of Denominations.

B.   The court's findings

In its order, the trial court made findings of fact regarding the religious practices of the Petersens and Rogers and Rowe. The court found that the Petersens are members of The Way International, describing this as a "Pentecostal, biblically-oriented Christian sect which encourages its members to lead an affirmative lifestyle and . . . to reflect religiosity by overtly speaking in tongues." The court found that Rogers and Rowe "were baptized and once were professing Catholics," and that Rogers believes The Way "is a network that isolated her and alienated her from her family and friends and influenced her under duress and undue prejudice causing her to make an adoption decision she almost immediately regretted." The court noted that Rogers was "extremely concerned" that Paul was being raised in The Way, and Rogers views The Way "as her enemy in her fight for her child."

The trial court also made findings regarding the home life of the Petersens and of Rogers and Rowe. The court found that the Petersens had raised Paul in a "most appropriate fashion, in a good home with great love and care and concern for his physical, his emotional and his spiritual well-being." The court found that Paul was above average in intelligence, and physically and emotionally normal for his age. The court noted that Mr. Petersen earned over $50,000 per year working for the Environmental Protection Agency, and that Mrs. Petersen operated a small day care center in their home. The court also noted that the Petersens had been married for twelve years at the time of the order.

The court found that both Rogers and Rowe had children from previous marriages as well as another child together, and that they were good parents to these children. Other findings included the fact that Rogers and Rowe have never been and were not married at the time of the court's order. Rogers earned about $12,000 per year working as dining room manager at a country club. Rowe expected to earn a yearly salary of $25,000 in a new sales position, along with $10,000 from a restaurant he owns.

The court concluded that both the Petersens and Rogers and Rowe are fit and proper persons to have custody of Paul. The court found that Paul was not eligible for adoption, his biological parents' rights had not been terminated, and his biological parents did not consent to any adoption. Due to "serious religious differences," "lengthy and strident court proceedings," and geographical distance,

the court decided joint custody between the Petersens and Rogers and Rowe was not possible, and stated that all experts except one recommended that Paul be immediately placed with his biological parents. The court concluded that Paul's best interests require that he live with his biological parents with no visitation from the Petersens unless consented to and approved by Rogers and Rowe.

II. Constitutional issues arising from admission of extensive evidence regarding The Way International

A. Permissible extent of religious inquiry in child custody proceedings

[1] We begin by recognizing the wide discretion vested in the trial judge in child custody proceedings. *In re Peal*, 305 N.C. 640, 290 S.E.2d 664 (1982). As part of the best interests analysis, our courts have considered the child's physical, mental, and spiritual welfare. *See Dean v. Dean*, 32 N.C. App. 482, 484, 232 S.E.2d 470, 472 (1977). When considering a child's spiritual welfare, however, a court must be careful not to infringe upon the religious freedom of the parties involved, a fundamental right guaranteed by our state and federal constitutions. The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Similarly, the North Carolina Constitution provides that "[a]ll persons have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences, and no human authority shall, in any case whatever, control or interfere with the rights of conscience." N.C. Const. art. I, § 13. Although the trial judge has wide discretion and control in child custody cases, we believe this discretion could be abused by a religious inquiry so extensive that it would violate this most basic of our fundamental rights and thus become an inquisition.

The Petersens concede that the best interests determination may include inquiry into the spiritual well-being of a child, but argue that making a "denominational inquiry the focal point of any such trial or to rest any decisions affecting the custody of a minor child on any denominational preference" is error. In oral argument counsel for the Petersens predicted a chilling effect upon future litigants if their religious beliefs may be subject to extensive examination in court.

PETERSEN v. ROGERS

[111 N.C. App. 712 (1993)]

Rogers, on the other hand, argues the religious practices of the Petersens are relevant because she gave up her child for adoption due to the influence of members of The Way International. Rogers emphasizes that religion is a proper area of inquiry for a court when making a determination of the best interests of a child, but agrees that a court should not make judgments based on religious preferences.

No North Carolina cases have addressed a situation involving an extensive religious inquiry in a child custody proceeding. Our courts have stated that although a court may consider a child's spiritual welfare as part of the best interests determination, *see Dean*, 32 N.C. App. at 484, 232 S.E.2d at 472, a court may not base its findings on its preference for any religion or particular faith. *Id.* at 483, 232 S.E.2d at 471.

In oral arguments before this Court, counsel for the Petersens suggested that an inquiry into the religious practices of the parties is permissible if it relates to the health and safety of the child, but that an inquiry into religious beliefs is not permissible. We agree that religious practices which may be harmful to a child require inquiry by the trial court. We find support for appellants' distinction between beliefs and practices in cases from other jurisdictions which have addressed the issue now before us. For example, in *Waites v. Waites*, 567 S.W.2d 326 (Mo. 1978), the Missouri Supreme Court stated that

> there is a vast difference between concentrating on the religious choice of a parent as compared to concentrating on what is best for the child. Inquiry into religious beliefs *per se* is impermissible; inquiry into matters of child development as impinged upon by religious convictions is permissible . . . . The difference here is not superficial but fundamental: the state shall prefer no faith but must favor the best interests of those children whose parental custody it determines.

*Id.* at 333 (reversing order giving custody to spouse of member of Jehovah's Witnesses). The Supreme Court of Ohio stated:

> To the extent that a court refuses to award custody to a parent because of her religious beliefs, the court burdens her choice of a religion in violation of the Free Exercise Clause of the United States Constitution. . . . On the other hand, a parent's actions are not insulated from the domestic relations

**PETERSEN v. ROGERS**

[111 N.C. App. 712 (1993)]

court's inquiry just because they are based on religious beliefs, especially actions that will harm the child's mental or physical health.

*Pater v. Pater*, 588 N.E.2d 794, 798 (Ohio 1992). *See also Quiner v. Quiner*, 59 Cal. Rptr. 503, 517 (Cal. Dist. Ct. App. 1967) (court noted "clear distinction between beliefs merely professed and acts indulged in pursuant to said beliefs"). *Cf. In re Short*, 698 P.2d 1310, 1313 (Colo. 1985) (evidence of practices *or* beliefs admissible if shown that reasonably likely to cause present or future harm to child).

The general rule is that a limited inquiry into the religious practices of the parties is permissible if such practices may adversely affect the physical or mental health or safety of the child, and if the inquiry is limited to the impact such practices have upon the child. Note, *The Establishment Clause and Religion in Child Custody Disputes: Factoring Religion into the Best Interest Equation*, 82 Mich. L. Rev. 1702, 1704-05 (1984) (hereafter "Note"); *see In re Hadeen*, 619 P.2d 374, 382 (Wash. App. 1980) (absent evidence of substantial threat to child's mental or physical welfare, improper to award custody to father based on mother's involvement with and complete submission to fundamentalist church). Although some courts have only permitted evidence showing actual harm to the child, *see Quiner*, 59 Cal. Rptr. at 516, we find a broader rule allowing inquiry into actual or potential harm to be more desirable. *See Short*, 698 P.2d at 1313 (court found actual harm standard too restrictive and adopted standard of whether beliefs or practices "reasonably likely" to cause present or future harm). We find that restricting the inquiry to the practices of the parties and the effect such practices have had or may in the future have upon the child in question sufficiently narrows the inquiry to avoid a chilling effect on the practice of religion yet protect the best interests of the child. We conclude that the limited inquiry may touch upon the religious practices of the parties as they relate to the health and safety of the child, but such inquiry may not focus on the general beliefs and doctrines of a religion. *See* Note at 1705.

B. The inquiry in the case at hand

[2] After reviewing the transcript of the trial court's proceedings it appears that many questions asked about The Way had no relevance to Paul's best interests, but rather focused on the theological beliefs held by members of The Way. While we neither

can nor will set down exactly what may or may not be asked, we will provide some examples from the transcript of questions which are clearly unacceptable in a court proceeding to determine custody of a child.

The following exchange between Mr. Michael Levine, attorney for Rogers and Rowe, and Ms. Kisser helps to illustrate the level of inquiry permitted in the trial court:

Q Okay. I believe I asked you . . . what religion encompassed or was involved with The Way International, whether or not it was a Christian religion, and your answer was something about traditional Christianity and non-traditional. Could you explain that, please?

A Right. . . . The Way International, the founder of it, published a book called Jesus Christ is Not God which articulates a main position of that religion. That Jesus Christ was a human being and not a divine being. He is called the Son of God. He is referred to in terms that are Lord and things like that, but the bottom line of the belief system is that he is a man and he is not divine or co-equal with God.

Additionally, they believe about the Holy Spirit, that the Holy Spirit is not a separate persona as traditional Christianity would hold it to be. It is, as they refer to it, a gift from the giver. And so, in essence, they believe in a God but they do not believe in a Trinity. And that, I think, is the simplest explanation I can give you that separates The Way International out as a belief system from the traditional, Christian belief systems that are evident in American society today.

The guardian ad litem questioned Ms. Kisser as follows:

Q . . . You have stated and others have stated that the members of The Way does [sic] not believe that Jesus Christ was God, the Son of God.

A Right.

Q That he possesses no qualities of a Diety [sic]?

A Right.

. . . .

PETERSEN v. ROGERS

[111 N.C. App. 712 (1993)]

Q Now, don't the people in The Way believe, however, that God was in Jesus?

A Now, you are getting into the semantics in the sense that they do not believe that—they believe that we all have a spark of divinity in us as individuals so that spark that was in Jesus could be in you or I if we are a believer too. But that would not make you or I God—equal to God in the Trinity, any more than it would make Jesus that way. For him having that divinity in him, that spark of divinity, he is no more or no less than you or I in God's eyes in that sense.

Q And is it true that even though The Way may not particularly espouse like mainstream religions that the Trinity is personified by three individuals, for lack of a better word, don't they believe and profess that their ability to speak in tongues is a result of the Spirit of the Holy Spirit descending upon them?

A But it still is not a persona. Like it is still—It is still a spiritual gift which is delivered onto you because of your level of believing.

. . .

And the Christian church, if you look at it as a historical existence, not in particular denominations, it is very clear on this point that such a position is heresy. Now, I'm not saying that's good or bad. I'm not making a judgment on it, but I'm saying if you look at the history of church literature, that is a heretical position.

The court also permitted counsel to question the accuracy of Way materials and beliefs. Mr. Doyle asked Ms. Kisser:

Q From the literature that you've reviewed in your work have you found a consistent point that there are some inaccuracies in what Dr. Wierwille [founder of The Way] has written concerning—and things that can be disproved that he has written concerning, for example, the language in which the Bible was written?

A Yes.

. . .

A . . . there is ample literature that has been written . . . that is of a scholarly nature that does dispute the actual accuracy, technically, of some of the claims.

The court permitted Ms. Davis to question Reverend Greene as follows:

Q Rev. Greene, do you know if The Way International is recognized as a religious denomination in the United States?

. . .

Q So it wouldn't surprise you then that in the Handbook of Denominations, The Way International is not listed?

The quoted passages do not in any way relate to Paul or the effect on Paul of the Petersens' involvement in The Way. Although Ms. Kisser expressed concern over some of the practices of The Way, she testified that she had never met the Petersens or Paul. Therefore, none of her testimony could have related to the present or possible future effect of the Petersens' religious practices on Paul. *See Pater v. Pater*, 588 N.E.2d 794, 800 (Ohio 1992) (expert opinions irrelevant where experts had never met child in question). Questions about Jesus Christ, evil spirits, speaking in tongues, tithing, and the Handbook of Denominations had no relevance to determining custody in the child's best interests. We note that other Christian sects practice speaking in tongues and believe in evil spirits. Unless evidence of such practices could be put in the context of this particular family, it was irrelevant.

Furthermore, the trial court's findings of fact did not indicate that the Petersens' religious practices were having a negative effect on Paul. The court found quite the opposite: that Paul

has been raised in a most appropriate fashion, in a good home with great love and care and concern for his physical, his emotional and his spiritual well-being. . . . Paul is an above average child intellectually and he is age-appropriate physically and emotionally. He is healthy and has had no significant illnesses since his birth.

Absent any evidence that Paul was adversely affected or would be adversely affected in the future by the religious practices, the court's acquiescence in the extensive inquiry was impermissible. To allow Ms. Kisser to speculate that the general practices and beliefs of members might be detrimental to children is to condemn

PETERSEN v. ROGERS

[111 N.C. App. 712 (1993)]

the entire membership of The Way as unsuitable parents. *See* *Pater*, 588 N.E.2d at 800 (court denounced expert's "blatant attempt to stereotype an entire religion" in speculating that mental illness more common among Jehovah's Witnesses than among general population). This result would certainly produce a chilling effect upon litigants in future cases where one spouse was a member of The Way or of some other lesser-known religion.

The trial judge attempted to explain her inquiry in the case at hand, stating that she felt "it is absolutely incumbent upon this Judge to understand what The Way is all about. . . . I wanted to know specifically what [Mrs. Petersen] thought, what she believed, and what she was doing . . . . I just want to know what it is. I know nothing about these people . . . ." In their brief, Rogers and Rowe explain that the court's inquiry was limited to the general teachings and practices of The Way, and did not involve the practices and beliefs of the Petersens themselves. However, this inquiry directly contradicts the rule that such examination must be limited to the religious practices of the parties involved and the effect of those practices upon the child in question.

It would be impossible for this Court to set forth exactly which questions may or may not be asked in this situation. We do note that some of the questions asked at trial were appropriate because they related directly to the impact of the Petersens' religious practices on Paul. For example, on direct examination Mr. Hassell asked Mrs. Petersen:

Q All right. Is there anything about your religious beliefs that has prohibited you or prevented you from seeking medical attention for Paul at any time?

A No.

* * * *

Q . . . Is there anything about your practice of your Christian, religious beliefs which requires you in any way to subject Paul to unusual discipline of any kind?

A No.

* * * *

Q . . . Is there anything about the—your membership within the ministry of The Way International that in any way controls

your own personal actions toward Paul or toward your husband, William Petersen?

A No.

The court itself posed several questions to Mrs. Petersen as follows:

> THE COURT: And in your talking about first aid, second aid and third aid, I believe your statement was that all of these aids could come concurrently or contemporaneously with seeking medical treatment at the same time?

A Yes . . . .

> THE COURT: Is there anything in your religious beliefs that would be equivalent to the Jehovah's Witnesses where they won't transfuse blood or —

. . .

where they would not allow surgery with the Christian Scientists or —

A (Interposing) No. We have some very fine surgeons that are involved in The Way Ministry.

> THE COURT: So medical treatment really is not a big deal with you all?

A No.

\* \* \* \*

> THE COURT: . . . And, is there anything in your religion that you would teach your son that would denigrate or derogate in any way the life-style of these people who are his natural, biological parents?

A I will not put them down in front of Paul. We will have to deal with these issues that are going to come up . . . .

Of notable interest is the fact that another court has addressed The Way International in the context of a child custody proceeding. In *Rogers v. Rogers*, 490 So. 2d 1017 (Fla. Dist. Ct. App. 1986), the trial court examined the same information involved in this case, some of it provided through the testimony of Ms. Kisser, and decided to award custody to the mother, a Way member, but

to condition custody upon her severing her connection with The Way. The appellate court reversed, allowing the mother to retain custody but finding that the condition was overbroad and restrictive of her constitutional right to freedom of religion.

III. Conclusion

We conclude that the Petersens should not have been subjected to the inquisition of their religion at trial. The unfamiliarity of a religion to the trial judge or other parties to a case should not serve as an excuse to delve so deeply into such private matters. In the absence of evidence of present or future physical or mental harm to the child in question, parties to a child custody dispute should not be placed in a position requiring them to explain or defend their religious beliefs. We note the potential influence unlimited inquiry could have upon the parties' religious choices. We find that the Petersens' right to freedom of religion guaranteed by the United States Constitution and the North Carolina Constitution was violated. The existence of this constitutional violation renders review of the visitation issue unnecessary. We reverse and remand to the trial court for proceedings free from unwarranted religious inquisition into the beliefs of the parties.

Reversed and remanded.

Judges JOHNSON and JOHN concur.