IN THE MATTER OF X. HUFF

No. COA99-1256

(Filed 17 October 2000)

**1. Termination of Parental Rights— failure to pay any costs of foster care—reasonable portion—no finding of specific amount**

The trial court did not err by finding that termination of parental rights was justified pursuant to N.C.G.S. § 7A-289.32(4), which requires a parent to pay a fair, just, and equitable portion of the cost of foster care, where the parents made no payments during the pertinent six-month period. Although the reasonable portion standard is often difficult to apply, zero is not a reasonable portion under the circumstances here. Moreover, there is no requirement that the court make a finding as to a specific amount that would constitute a reasonable portion.

**2. Termination of Parental Rights— religious inquiry— Wiccan parents**

The trial court did not err in a termination of parental rights proceeding by permitting questioning and testimony concerning the religious beliefs and practices of the Wiccan parents where the inquiry was appropriately brief and was a far cry from the "inquisition" prohibited by *Peterson v. Rogers*, 111 N.C. App. 712; the questions addressed the ways in which the parents' religious beliefs might impact their behavior in specific ways rather than focusing on the general beliefs and doctrines of the religion; the inquiry was primarily directed at the father rather than an expert; and the court made no findings regarding the religious practices of the parties and there is no indication that the religious inquiry impacted the trial court's decision.

**3. Termination of Parental Rights— six children in seven years—few resources—finding not unconstitutional**

The constitutional rights of the respondents in a termination of parental rights proceeding were not violated by a finding that the mother gave birth to six children in seven years despite the fact that the parents had few financial resources. In a termination of parental rights proceeding, there are factors that may be weighed against a parent that might be constitutionally protected in other circumstances. The findings here, while arguably infring-

ing on the autonomy of the parents to some degree, are appropriate considerations within this context since they bear directly on the likelihood of future neglect of the child.

### 4. Termination of Parental Rights— findings—adopted from prior reviews

The trial court did not err in a termination of parental rights proceeding by reciting and adopting findings from prior review hearings involving placement of the child where five findings out of fifty reiterated factual findings from prior review hearings and the court considered conditions after the loss of custody as well as evidence of neglect prior to losing custody. The court's determination that termination of parental rights was in the best interests of the child was independent of the prior adjudication of neglect.

### 5. Evidence— hearsay—authentication of documents—bench trial—no showing of reliance by court

There was no prejudicial error in a bench trial involving termination of parental rights where the court admitted hearsay statements and medical documents allegedly not properly authenticated. An appellant must show that the court in a bench trial relied upon the incompetent evidence; here, respondents offer brief suggestions as to how the evidence could have impacted the court's judgment in theory, but nothing specific.

### 6. Termination of Parental Rights— neglect—best interests of child

The trial court did not err by concluding that it was in the child's best interests to terminate parental rights where the picture painted by the transcript and the record portrays parents who failed over an extended period to provide a healthy and safe environment and who failed to show significant improvement in their parental abilities after removal of the child. There was overwhelming evidence that the parents have not accepted responsibility for the ways in which their actions caused their family problems and the chronic nature of the behavior creates a significant likelihood of future neglect.

Appeal by respondents from order entered 6 January 1999 by Judge William A. Christian in Harnett County District Court. Heard in the Court of Appeals 15 August 2000.

*The Woodall Law Firm, P.A. by E. Marshall Woodall, for petitioner-appellee.*

*Bain & McRae by Alton D. Bain, for respondent-appellant Tampatha C. Huff.*

*Richard E. Jester, for respondent-appellant James J. Huff.*

*McLeod & Harrop by Donald E. Harrop, Jr., as Guardian ad Litem.*

Smith, Judge.

The Harnett County Department of Social Services (petitioner) filed a petition to terminate the parental rights of respondents (the parents) Tampatha C. Huff (the mother) and James J. Huff (the father) to their child, Xavier J. Huff (the child). The trial court ordered termination of respondents' parental rights, and respondents appeal from that order. We affirm.

The child, born 22 December 1994, was initially removed from respondents' home and placed in foster care in September 1995. The child was subsequently adjudicated a neglected juvenile and his physical and legal custody were awarded to petitioner on 20 October 1995. Placement of the child was reviewed at five hearings between March 1996 and October 1997. At the fourth review hearing in April 1997, physical placement of the child was given to his paternal grandparents, with whom he presently resides. On 7 August 1997, petitioners filed a petition to terminate the parental rights of respondents pursuant to Article 24B, Chapter 7A of our General Statutes. The petition alleged that grounds for terminating respondents' parental rights existed under three separate subsections of N.C.G.S. § 7A-289.32 (1996): subsection (2) (neglect or abuse), subsection (3) (child willfully left in foster care for 12 months), and subsection (4) (parents' willful failure to pay reasonable portion of cost of care for the child).

A proceeding for termination of parental rights involves two stages. At the adjudication stage, the petitioner must show by clear, cogent, and convincing evidence that one or more of the grounds warranting termination, as set forth in G.S. § 7A-289.32, exist. N.C.G.S. § 7A-289.30(e) (1996). If one or more of the specific grounds listed in the statute are shown, then the court moves to the disposition stage to determine whether it is in the best interests of the child

to terminate the parental rights. N.C.G.S. § 7A-289.31 (1996). The standard for review in termination of parental rights cases is whether the court's "findings of fact are based upon clear, cogent and convincing evidence" and whether the "findings support the conclusions of law." *See In re Allred,* 122 N.C. App. 561, 565, 471 S.E.2d 84, 86 (1996) (citation omitted).

The trial court determined that termination of parental rights was warranted pursuant to all three of the grounds alleged in the petition. The trial court then concluded that it was in the best interests of the child to terminate parental rights, and ordered the termination of respondents' parental rights on 6 January 1999. Respondents appeal from that order, bringing forth 24 assignments of error which we have condensed into six main issues for review.

I.

**[1]** Respondents first assign error to the trial court's finding that termination of parental rights was warranted pursuant to subsection (4) of G.S. § 7A-289.32. This subsection provides for termination of parental rights where

[t]he child has been placed in the custody of a county Department of Social Services . . . or a foster home, and the parent, for a continuous period of six months next preceding the filing of the petition, has wilfully failed for such period to pay a reasonable portion of the cost of care for the child although physically and financially able to do so.

G.S. § 7A-289.32(4). Subsection (4) requires a parent "to pay that portion of the cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay." *In re Clark,* 303 N.C. 592, 604, 281 S.E.2d 47, 55 (1981).

In the present case, the pertinent six-month period preceding the filing of the petition is 7 February 1997 to 7 August 1997. During this time, neither parent made any payments toward the cost of care for the child. At the hearing, neither parent offered any specific reasons for their failure to pay support. When the father was asked why he failed to pay any support, he answered, "I don't think I know how to answer that question, sir." When the mother was asked the same question, she stated that she did not make any support payments because she and her husband "were trying to get [their] finances . . . in order."

**IN RE HUFF**

[140 N.C. App. 288 (2000)]

Respondents do not dispute the following factual findings of the trial court. The parents initially obligated themselves to pay child support for the child while in foster care by signing a service agreement on 6 December 1995. Despite the fact that social workers advised the parents that failure to pay support could be grounds for termination of their parental rights, the parents failed to pay any support through December 1996, at which time the parents moved to Asheboro, North Carolina. After moving, the parents failed to provide their new address to the Child Support Enforcement Office (the CSEO). Despite making numerous efforts to contact the parents, the CSEO heard nothing from the parents until approximately 17 months later, when the parents came to the CSEO for paternity testing. After canceling one appointment to discuss child support, the parents eventually signed a Voluntary Support Agreement on 26 June 1998.

The cost of foster care placement for the six-month period immediately preceding the filing of the petition was $828.00. Neither parent made any support payments during the relevant six-month period. Furthermore, neither parent made any support payments whatsoever until over a year after the petition to terminate parental rights was filed. On 30 October 1998, after being found guilty of criminal contempt for non-payment of court-ordered support, the mother paid the sum of $239.70 toward care for the child. The father has yet to make any payments, and there is a criminal contempt citation currently pending against the father for his failure to make any payments.

"On review, this Court must determine whether the trial court's findings of fact were based on clear, cogent, and convincing evidence." *In re Oghenekevebe*, 123 N.C. App. 434, 435-36, 473 S.E.2d 393, 395 (1996) (citation omitted). We believe there was ample evidence from which the trial court could find that the parents willfully failed to pay a reasonable portion of the cost of care for the child.

Respondents attempt to rely on *Bost v. Van Nortwick*, 117 N.C. App. 1, 449 S.E.2d 911 (1994), for the proposition that a "willful" failure to pay support cannot be shown where a parent is "unable" to pay child support due to an inability to maintain employment. Respondents argue that they were unable to make any support payments because they were supporting two minor children, they were attempting to reduce their debt, and they were unable to maintain steady employment. Initially, we note that both parents were employed for at least half of the relevant six-month period. We also note that, in fact, the parents were caring for only one minor child

IN RE HUFF

[140 N.C. App. 288 (2000)]

during this time (the second minor child referred to by respondents was not born until 13 June 1998).

More importantly, respondents' reliance on *Bost* is misplaced. *Bost* involved the specific situation in which a parent is unable to pay support due to a "psychological or emotional illness." *Id.* at 16, 449 S.E.2d at 919. The father in that case was unable to pay child support because his "severe alcoholism" rendered him unable to maintain permanent employment. *Id.* at 16, 449 S.E.2d at 920. The Court held that in such cases a parent's failure to pay support may be justified. *Id.* at 17, 449 S.E.2d at 920. While it is clear that respondents have had some difficulty in maintaining employment, respondents have not indicated that any unemployment during the relevant six-month period was a result of some "psychological or emotional illness" that would warrant a finding that their failure to pay support was not "willful" under the reasoning in *Bost*. In fact, any unemployment during this period appears to have occurred only after the parents voluntarily terminated previous jobs.

Also, despite respondents' arguments to the contrary, there is no requirement that the trial court make a finding as to what specific amount of support would have constituted a "reasonable portion" under the circumstances. The cases cited by respondents simply require that the trial court make specific findings that a parent was able to pay some amount greater than the amount the parent, in fact, paid during the relevant time period. *See In re Garner*, 75 N.C. App. 137, 141, 330 S.E.2d 33, 36 (1985); *In re Manus*, 82 N.C. App. 340, 349-50, 346 S.E.2d 289, 295 (1986). In the case at bar, the trial court satisfied this requirement.

The parents failed to pay any portion of the cost of care for the child during the relevant six-month period. Although the "reasonable portion" standard is often a difficult standard to apply, *see Clark*, 303 N.C. at 604, 281 S.E.2d at 55, we have no difficulty concluding that zero is not a reasonable portion under the circumstances here. We hold that the trial court did not err in concluding that the parents were able to pay some amount above zero. This assignment of error is overruled. Furthermore, because we hold that termination was proper pursuant to subsection (4) of G.S. § 7A-289.32, it is unnecessary to address respondents' assignments of error pertaining to the other two subsections of the statute on which the trial court based its decision. *See In re Davis*, 116 N.C. App. 409, 413, 448 S.E.2d 303, 305, *disc. review denied*, 338 N.C. 516, 452 S.E.2d 808 (1994).

IN RE HUFF

[140 N.C. App. 288 (2000)]

## II.

**[2]** Respondents next argue the trial court erred in permitting questioning and testimony concerning the religious beliefs and practices of the parents. The parents in this case belong to a religion referred to during the proceedings as "WICCA" or "Wicken" (hereinafter Wicken). Other than a few brief remarks by three witnesses, the only inquiry into the religion of the parents occurred when the trial court permitted the guardian ad litem to question the father about his religious beliefs.

This line of questioning comprises approximately six pages of the transcript. The father was asked whether his wife is a "witch" and what this term means. The father responded that his wife is a witch, and that this term is used in the Wicken religion "to describe someone who believes in the faith." The father was then asked whether his wife can cast a spell, and he responded that he did not know. He was also asked whether he was aware that his wife had once stated that the reason one of her children slept well on a particular night while in the hospital was because she had cast a spell. The father stated he was not aware of this incident.

Following some additional questioning about casting spells, the guardian ad litem asked the father about spells within the context of the father's ability to find employment:

Q: Well, do you pray that you'll get a job?

MR. BAIN: Objection.

THE COURT: Overruled.

A: Yes, I do pray that I can get a job.

Q: Is that what you're relying on to help you get a job?

A: No, I don't rely on it. Many [sic] of this is very sympathetic in nature, if you look at it from a psychological standpoint. The fact of praying, in and of itself, is what helps bolster the human spirit. The way that I prefer to pray, the way that I think deep down will ultimately help me is probably unorthodox in this part of the country but is the way that I still choose to do so.

We are faced here with the specific tension that occasionally arises between, on the one hand, the objective of determining the best interests of the child, and, on the other hand, the desire to avoid

infringing upon the religious freedom of the parties involved. We addressed this same issue in depth in *Petersen v. Rogers*, 111 N.C. App. 712, 433 S.E.2d 770 (1993), *rev'd on other grounds*, 337 N.C. 397, 495 S.E.2d 901 (1994).

*Petersen* involved a child custody proceeding to determine whether custody of Paul, the minor child in question, would be transferred to Paul's biological parents, who had consented to Paul's adoption but had subsequently revoked their consent, or whether custody would remain with the Petersens, the parents who had adopted Paul. During the proceedings the court admitted testimony about the Petersens' involvement with a religious organization known as "The Way." The court allowed two witnesses to testify about The Way, which testimony comprised 147 pages of the transcript and involved an "in-depth examination of the general beliefs, tenets, and practices of members of The Way." *Id.* at 715, 433 S.E.2d at 773.

In its order, the trial court made findings of fact regarding the religious practices of the Petersens and the biological parents. *See id.* at 716, 433 S.E.2d at 773. The trial court also made findings regarding the home life of the Petersens and of the biological parents, and concluded that both the Petersens and the biological parents were fit and proper persons to have custody of Paul. *See id.* However, the court concluded that Paul's best interests required that he live with his biological parents, with no visitation from the Petersens unless approved by the biological parents. *See id.* at 717, 433 S.E.2d at 774.

On appeal, this Court reversed and remanded, holding that the religious inquiry at trial had violated the First Amendment rights of the Petersens. *See id.* at 725, 433 S.E.2d at 778. The Court set forth the general rule that "a limited inquiry into the religious practices of the parties is permissible if such practices may adversely affect the physical or mental health or safety of the child, and if the inquiry is limited to the impact such practices have upon the child." *Id.* at 719, 433 S.E.2d at 775 (citations omitted). The Court placed special emphasis on the difference between inquiry into the *practices* of a religion, and inquiry into the *beliefs* of a religion, and concluded that "the limited inquiry may touch upon the *religious practices of the parties* as they relate to the health and safety of the child, but such inquiry may not focus on the *general beliefs and doctrines* of a religion." *Id.* (citation omitted) (emphasis added). We are guided by the reasoning in *Petersen* in holding that there occurred no violation of the respondents' First Amendment rights in the present case.

**IN RE HUFF**

[140 N.C. App. 288 (2000)]

### A.

The most significant factor that distinguishes *Petersen* from the present case is the extent of the religious inquiry. The Court in *Petersen* treated the extent of the religious inquiry, including 147 pages of testimony from two witnesses called solely to testify about The Way, as a determinative factor in its analysis. The Court recognized that "[a]lthough the trial judge has wide discretion and control in child custody cases, we believe this discretion could be abused by a religious inquiry *so extensive* that it would violate [the First Amendment rights of the parties involved] and thus become an inquisition." *Id.* at 717, 433 S.E.2d at 774 (emphasis added). The Court found that precisely such a religious "inquisition" had occurred, and for this reason reversed and remanded the case to the trial court "for proceedings free from unwarranted religious inquisition into the beliefs of the parties." *Id.* at 725, 433 S.E.2d at 778.

In the case at bar, the religious inquiry consisted of a few brief remarks by three witnesses, and six pages of inquiry during the examination of the father. This inquiry can hardly be described as an "inquisition." Furthermore, it would be unrealistic to expect a trial court to be able to make a determination about whether the religious practices of the parents "may adversely affect the physical or mental health or safety of the child," *id.* at 719, 433 S.E.2d at 775, without first allowing some brief inquiry into the religious practices of the parents. In other words, a trial court must have some preliminary information regarding the religious practices of the parents in order to determine whether the "limited inquiry" permitted by *Petersen* is appropriate. The inquiry that transpired in this case was appropriately brief, and a far cry from the type of "inquisition" prohibited by *Petersen.*

### B.

In addition to the extent of the inquiry, the nature of the inquiry played a significant role in the Court's analysis in *Petersen,* and distinguishes that case from the case at bar. The *Petersen* Court stated that a limited inquiry "may touch upon the religious practices of the parties as they relate to the health and safety of the child, but such inquiry may not focus on the general beliefs and doctrines of a religion." *Id.* at 719, 433 S.E.2d at 775. In *Petersen,* the expert witness was asked general questions about the tenets of The Way, such as whether The Way is a Christian religion and whether members of The Way believe that Jesus Christ was the Son of God. *See id.* at 720-21, 433 S.E.2d at 775-76.

By contrast, the questions put to the father in the present case address the ways in which the parents' religious beliefs might impact their behavior in specific ways. For example, the father was asked whether he was aware that the mother believes that casting spells can affect the behavior of their children. He was also asked whether he believes that a spell can impact his ability to get a job. We believe these sorts of questions are the kinds of questions that are permissible under *Petersen*.

Furthermore, these questions appear especially appropriate within the context of this case. One of the recurring themes during the proceedings was the notion that the parents have such an unusually strong need to portray themselves in a positive light that they distort reality as a result. For example, Dr. Robert Aiello testified that the mother's score on the Minnesota Multiphasic Personality Inventory revealed a "remarkable" need to present herself "in the most favorable light possible in all circumstances," resulting in the inability to accept responsibility for how her behavior contributes to her family problems.

The trial court stated at the conclusion of the proceedings that the parents "have continued to demonstrate, really, an apparent misunderstanding of their responsibility in terms of child care," and that "both parents seem to have an altered sense of reality" in that "[t]hey've failed to recognize dangers to the children inherent in their personal living habits and hygiene." While respondents argue that the trial court's use of the phrase "altered sense of reality" reveals an improper consideration of the religion of the parents, we feel that, when placed in context, this phrase merely emphasizes the degree to which the parents are unwilling to accept responsibility for their actions.

The trial court found as fact that "[t]he parents have failed to accept responsibility for their contributions to the problems that resulted in the removal of the child from the home and the child's continued placement in care." Within this context, it seems quite appropriate that the father was questioned about whether he and his wife rely on spells to solve practical problems such as putting a child to sleep or finding employment.

C.

The Court in *Petersen* found especially troubling the fact that testimony was admitted regarding The Way from two witnesses, one a

IN RE HUFF

[140 N.C. App. 288 (2000)]

qualified expert and the other a Way minister. The Court stated that "[a]lthough [the expert witness] expressed concern over some of the practices of The Way, she testified that she had never met the Petersens or Paul. Therefore, none of her testimony could have related to the present or possible future effect of the Petersens' religious practices on Paul." *Id.* at 722, 433 S.E.2d at 776-77. Thus, whether religious inquiry is appropriate depends, in part, on the person at whom such inquiry is directed, and that person's relationship to the family in question.

The limited religious inquiry in the present case was primarily directed at the father regarding the parents' religious practices. Such inquiry is inherently relevant to the present or possible future impact of the parents' religious practices on the child. We perceive a significant difference between, on the one hand, questioning a father about the religious practices of the family, and, on the other hand, questioning an expert witness and a minister about the general tenets of the religion.

### D.

It was also significant in *Petersen* that the trial court made findings of fact regarding the religious practices of the parties. *See id.* at 716, 433 S.E.2d at 773. For example, the trial court found that the Petersens were members of The Way, describing The Way as a "Pentecostal, biblically-oriented Christian sect which encourages its members to lead an affirmative lifestyle and . . . to reflect religiosity by overtly speaking in tongues." *Id.* These factual findings indicated that the trial court had been influenced by the religious practices of the parties.

In the case at bar, the trial court made no findings regarding the religious practices of the parties. In a bench trial, it is presumed that the judge disregarded any incompetent evidence. *In re Paul*, 84 N.C. App. 491, 497, 353 S.E.2d 254, 258, *disc. cert. denied*, 319 N.C. 673, 356 S.E.2d 779 (1987), *cert. denied*, 484 U.S. 1004, 98 L. Ed. 2d 646 (1988). Therefore, even assuming *arguendo* that the trial court erred in allowing any religious inquiry, such error was not prejudicial because there is no indication that the testimony impacted the trial court's decision.

Furthermore, in *Petersen* there was little evidence weighing in favor of placing custody with the biological parents other than the religious considerations. Therefore, it appeared likely that the trial

court's determination had been influenced by these considerations. In the present case, there was an overwhelming amount of evidence unrelated to the religion of the parents to support the trial court's termination of parental rights. Thus, any error in allowing the religious inquiry was not prejudicial.

This assignment of error is overruled.

## III.

[3] Respondents next assign as error the factual finding of the trial court that "[n]otwithstanding the fact that the respondent parents had little financial resources available to them, the respondent mother gave birth to six children in seven years." Respondents argue that procreation and parenthood are matters protected by the State and Federal Constitutions, and that the trial court's consideration of these matters violated the constitutional rights of the parents. After careful consideration, we believe the trial court's consideration of the number of children born to the mother was an appropriate consideration of one relevant fact among many related to the future well-being of the child.

Respondents correctly assert that "[t]he Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education." *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 12, 431 S.E.2d 828, 833, *dismissal allowed, disc. review denied*, 335 N.C. 175, 436 S.E.2d 379 (1993), *cert. denied sub nom. Winfield v. Kaplan*, 512 U.S. 1253, 129 L. Ed. 2d 894 (1994) (citing *United States v. Orito*, 413 U.S. 139, 142, 37 L. Ed. 2d 513, 517 (1973)). However, within the context of a termination of parental rights proceeding, there are factors that may properly be weighed against a parent that, in other circumstances, might be constitutionally protected from consideration. For example, this Court has upheld termination of parental rights where one of the factors considered by the trial court was the mother's marriage to a boyfriend who had previously sexually abused the child in question. *See In re Parker*, 90 N.C. App. 423, 368 S.E.2d 879 (1988). Such consideration is appropriate because, where a mother chooses to marry a man who has previously abused her child, there is obviously an increased likelihood that the child will suffer further harm if parental rights are not terminated. Similarly, where parents continue to have additional children despite significant financial difficulties, and despite a chronic pattern of neglecting their children, there is an

increased likelihood that a child in their care will continue to be neglected as a result of the diminishing attention and resources the child will receive.

In the present case, the factual finding at issue appeared within a long list of findings that the trial court considered in reaching its conclusion. For example, the factual finding that appears immediately after the finding in question states:

> The parents have had three children since the removal of the subject child from their home on September 7, 1996, two of which reside with them. Since the birth of these latter two children, the parents have been the subject of at least four investigations by the Randolph County Department of Social Services; at least two of the investigations have been substantiated. Substantiation was made in connection with the parents' fifth child . . . due to among other things, medical neglect and unsanitary and unsuitable living conditions.

Such findings, while arguably infringing on the autonomy of the parents to some degree, are appropriate considerations within this context since they bear directly on the likelihood of future neglect of the child. Therefore, we hold that the trial court's consideration of the finding in question does not amount to a violation of respondents' constitutional rights. This assignment of error is overruled.

## IV.

[4] Respondents next argue the trial court erred in "reciting and adopting as its findings" the findings of fact from prior review hearings involving placement of the child. Respondents correctly concede that "a prior adjudication of neglect may be admitted and considered by the trial court in ruling upon a later petition to terminate parental rights on the ground of neglect." *In re Ballard*, 311 N.C. 708, 713-14, 319 S.E.2d 227, 231 (1984). We further agree with respondents that *Ballard* requires the trial court in such cases to make an "independent determination" as to whether grounds exist for termination at the time of the hearing. *Id.* at 716, 319 S.E.2d at 223. However, we disagree with respondents' assertion that the trial court in the instant case failed to make an independent determination.

The trial court provided fifty detailed findings of fact, comprising almost twenty pages in the record. Five of these findings reiterated factual findings from prior review hearings. The trial court properly considered both evidence of neglect by the parents prior to losing

IN RE HUFF

[140 N.C. App. 288 (2000)]

custody of the child (including the prior adjudication of neglect) as well as evidence of conditions since that time showing a likelihood of neglect in the future. The trial court made a determination, independent of the prior adjudication of neglect, that termination of parental rights was in the best interests of the child at the time of the hearing. This assignment of error is overruled.

## V.

**[5]** Respondents next argue the trial court erred in admitting in evidence various hearsay statements, as well as medical documents which allegedly were not properly authenticated. The mere admission by the trial court of incompetent evidence over proper objection does not require reversal on appeal. *See Best v. Best*, 81 N.C. App. 337, 341, 344 S.E.2d 363, 366 (1986). "Rather, the appellant must also show that the incompetent evidence caused some prejudice." *Id.* In the context of a bench trial, an appellant "must show that the court relied on the incompetent evidence in making its findings." *Id.* at 342, 344 S.E.2d at 366 (citation omitted). "Where there is competent evidence in the record supporting the court's findings, we presume that the court relied upon it and disregarded the incompetent evidence." *Id.* (citation omitted).

In the present case, although respondents offer some brief suggestions as to how admission of the evidence in question, in theory, could have impacted the trial court's judgment, respondents offer nothing specific to rebut the presumption that the trial court disregarded any incompetent evidence that may have been admitted. Thus, even assuming *arguendo* that the evidence was improperly admitted, respondents have failed to demonstrate prejudicial error. This assignment of error is overruled.

## VI.

**[6]** Finally, respondents assign as error the trial court's determination that it would be in the best interests of the child to terminate respondents' parental rights. Even where a trial court finds that one or more grounds exist which warrant termination of parental rights, termination of parental rights is only required where the trial court further concludes that it would be in the best interests of the child to do so. G.S. § 7A-289.31.

In the instant case, the picture painted by the transcript and the record portrays parents who have failed over an extended period of time to provide a healthy and safe environment for their children, and

**IN RE HUFF**

[140 N.C. App. 288 (2000)]

who have failed to show any significant improvement in their parental abilities since the removal of the child in question by petitioner. There was overwhelming evidence presented at the hearing that the parents have not accepted responsibility for the ways in which their own actions have caused their family problems. The chronic nature of such behavior creates a significant likelihood of future neglect. We recite just a few of the factual findings that support this conclusion:

(1) The child was removed from the care of the respondent parents partially for the reason of the unsanitary condition in which the parents maintained their home to include dirty and cluttered conditions with clothes, dirty dishes, bags of garbage, and particles of food on the tables and floors, and the presence of roaches and flies. After September of 1995, the parents continued to allow their home to remain in an unsanitary, unhygienic, and unsuitable condition.

(2) [S]ince January, 1997 [the parents] have not visited with the child at all, have not sent the child any letters, pictures, birthday cards . . . . The parents have spoken to the child by telephone on only one occasion since April of 1996. At all times relative [sic] hereto the parents have had the address and telephone number of the child.

(3) Since the birth of [the parents' fifth child], born January 17, 1997, [this fifth child] has been hospitalized three times for medical problems associated with asthma or reactive airway disease. The parents have failed to comply with the recommendations of Dr. Mary Johnson regarding proper treatment of and a proper home environment for [this child]. Specifically, the parents continue to this date to smoke and to expose the child to cigarette smoke despite being instructed on numerous occasions not to smoke around the child . . . . As recently as November, 1998, the respondent parents smoked marijuana in the presence of their children and the parents have a pending charge of simple possession of marijuana in Randolph County, North Carolina. The respondent parents also failed to keep an appointment for the child to be evaluated at Baptist Hospital for a heart murmur.

(4) Dr. Robert Aiello who performed the psychological evaluation of the respondent mother testified that in the absence of critical self-examination and intensive counseling as recom-

mended by him, future children in the custody of the respondent mother would be at risk.

(5) Both parents have failed to obtain psychological counseling as recommended and ordered. . . . The respondent mother has neither sought nor attended counseling since [March 1997].

Based on the foregoing findings, we cannot say that the trial court erred in concluding that it was in the child's best interests to terminate respondents' parental rights. Therefore, this assignment of error is overruled.

In conclusion, we find no prejudicial error in the proceeding to terminate respondents' parental rights. Furthermore, we hold that the trial court's findings of fact were supported by the evidence, and that the trial court's conclusions were supported by the findings of fact. The order entered by the trial court is affirmed.

Affirmed.

Judges GREENE and EDMUNDS concur.