IN RE: D.L.W., Minor Child.
No. COA06-1715
Court of Appeals of North Carolina.
Filed November 6, 2007
This case not for publication
Richard Croutharmel, for guardian ad litem-appellee.
Winifred H. Dillon, for respondent-appellant-Mother.
Terry F. Rose, for respondent-appellant-Father.
CALABRIA, Judge.
Cheri H. ("the mother") and Donald W. ("the father") (collectively, "the parents") appeal from an order terminating their parental rights to their minor child, D.L.W. We affirm, but remand to the trial court for correction of the wording of the trial court's order terminating the respondents' parental rights.
Respondents are the biological parents of D.L.W. On 19 July 2002 the Wake County Department of Social Services ("DSS") received a child protective services report alleging that medical examinations of D.L.W. revealed he had suffered a fractured rib and a thin subdural hematoma. Although D.L.W. was in the sole care and custody of his parents at the time his injuries occurred, the parents had no explanation for his injuries and denied any wrongdoing. Nevertheless, they signed a Safety Assessment Agreement.
On 24 July 2002, hospital personnel reported to DSS the data from D.L.W.'s injuries revealed the injuries appeared to be non-accidental, and occurred as a result of either severe head trauma or "Shaken Baby Syndrome." In addition, D.L.W. had vision problems caused by bleeding on his brain, and on 6 July 2002 while still in the hospital, D.L.W. started having seizures. As a result of his injuries, D.L.W. was diagnosed as having Cerebral Palsy, a fractured rib, reflux disorder, and high blood pressure. He also was visually impaired and developmentally delayed.
DSS subsequently filed a juvenile petition, assumed custody of D.L.W., and placed him in a foster home on 2 August 2002. At the adjudication hearing on 20 November 2002, both parents consented to the trial court's order finding D.L.W. was abused and neglected based on the facts alleged in the juvenile petition. At this hearing, the trial court ordered both parents to enroll and participate in parenting classes, complete psychological evaluations and follow the recommendations from those evaluations, receive training on proper care for D.L.W.'s special medical needs, and enroll and participate in separate anger management classes.
Although D.L.W. progressed in his foster care placement, the maternal grandparents requested, and both parents supported, D.L.W.'s placement with them. On 11 September 2003, although the trial court expressed concern about the maternal grandparents' ability to care for D.L.W., the trial court ceased reunification efforts with the parents, ordered a permanent plan of legal custody with D.L.W.'s maternal grandparents, and ordered supervised visitation for the parents. Despite individual instruction, neither the maternal grandparents nor the parents were able to demonstrate an ability to care for D.L.W.'s special medical needs. On 4 December 2003, the trial court changed the permanent plan for the minor child to adoption since reunification efforts with both parents was considered futile or inconsistent with D.L.W.'s safety.
On 7 January 2004, both parents relinquished their parental rights to the maternal grandparents, and DSS accepted these relinquishments. During the six month period, neither the maternal grandparents nor the parents showed the ability to care for D.L.W's special medical needs. On 7 September 2004, DSS filed a petition to terminate the mother's parental rights. On 4 October 2004, DSS filed an amended petition to terminate both parents' parental rights. Hearings were held on seven individual court dates over a period of more than four months, from 29 June 2005 to 9 November 2005. On 12 December 2005, the trial court terminated respondents' parental rights. From the order terminating the parents' parental rights, the father timely appealed. Although the mother did not timely appeal, we granted her petition for a writ of certiorari; therefore, we consider her arguments on the merits.
There are two phases in hearings to terminate parental rights: (1) the adjudication phase, governed by N.C. Gen. Stat. § 7B-1109 (2005); and (2) the disposition phase, governed by N.C. Gen. Stat. § 7B-1110 (2005). In re Baker, 158 N.C. App. 491, 493, 581 S.E.2d 144, 146 (2003). Findings made by the trial court in the adjudicatory phase must be supported by clear, cogent and convincing evidence, and the findings must support a conclusion that at least one statutory ground for termination of parental rights exists. In re Shermer, 156 N.C. App. 281, 285, 576 S.E.2d 403, 406 (2003).
The standard of review on appeal is whether the trial court's findings of fact are supported by clear, cogent and convincing evidence and whether the conclusions of law are supported by the findings of fact. In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000). An appellate court is bound by the trial judge's findings of fact "where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." In re Montgomery, 311 N.C. 101, 110-11, 316 S.E.2d 246, 252-53 (1984) (citation omitted). A trial court needs to find only one statutory ground for termination before proceeding to the dispositional phase of the hearing. N.C. Gen. Stat. § 7B-1111(a) (2005); Shermer, 156 N.C. App. at 285, 576 S.E.2d at 406. In the dispositional phase, the trial court determines whether termination of parental rights is in the best interests of the child. In re Blackburn, 142 N.C. App. 607, 610, 543 S.E.2d 906, 908 (2001).
Here, since both parents argue numerous findings of fact were not supported by clear, cogent and convincing evidence, we combine these issues and address them as they relate to both parents. The parents contest the trial court's findings of fact that they have not demonstrated an ability to accept training on properly caring for D.L.W.'s special medical needs, that they have not shown the court they can be proper advocates for D.L.W., and that they have not assisted law enforcement to determine who harmed D.L.W. Aside from these findings of fact, they also contest the grounds the court found were sufficient to warrant a termination of their parental rights pursuant to N.C. Gen. Stat. § 7B-101 (2005), and that termination of their parental rights is in the child's best interests.

I. Training
The parents contest the findings that: (1) they did not accept training on how to care for D.L.W. and allowed the maternal grandparents[1] to receive the essential training on how to care for D.L.W.;(2) they only showed concern for D.L.W.'s hair and clothing, and have not shown concern for how to meet D.L.W.'s special needs; (3) they have not demonstrated an ability for caring for D.L.W.; (4) they are more concerned about their own needs than those of D.L.W.; (5) they did nothing to put themselves in the position to care for D.L.W. before or after the 5 August 2003 hearing; (6) they relied on the maternal grandparents to provide care to D.L.W. although the maternal grandparents were unable to provide adequate care to D.L.W.; (7) although they knew since 5 August 2003 that the maternal grandparents were unable to provide a permanent placement for D.L.W., the parents did not do what was necessary to have D.L.W. returned to their care; and (8) they have not shown they can properly protect D.L.W. nor have they acknowledged what is needed for D.L.W.'s future.
The trial court's findings of fact are summarized as follows. Both the parents and maternal grandparents received the same amount of instruction on how to care for D.L.W.'s special medical needs. However, both the parents and maternal grandparents were unable to satisfactorily demonstrate an ability to care for D.L.W.'s special needs.
According to the DSS report, the parents did not provide stretching and range of motion exercises for D.L.W. during the visits. In general, the parents were unaware of D.L.W.'s needs. For example, in several of their visits with D.L.W., they wanted to play with his hair despite being told repeatedly D.L.W. does not like his head touched. During one of the visits, the parents braided D.L.W.'s hair. That evening, D.L.W. cried in his foster parent's lap, was awake most of the night, and was unable to relax the next day in order for the physical therapist to work with him. The parents did not try to stimulate D.L.W. or help him learn to do things on his own. Additionally, the parents seldom selected the proper position to hold D.L.W. in order to adequately support his head.
Aside from the parents, the trial court found the maternal grandparents also did not show a capability to care for D.L.W.'s special medical needs. The DSS report revealed that the maternal grandparents worked with DSS for a period of 15 months trying to learn how to care for their grandson's medical needs. However, during this 15 month period, they were unable to remember the correct terminology concerning D.L.W.'s various disabilities, they were unable to comprehend a basic understanding of D.L.W.'s medical issues, they could not remember D.L.W.'s medications or his routine for taking them, they failed to inform medical personnel entirely of D.L.W.'s ongoing condition, and they failed to incorporate D.L.W.'s stretching exercises into a daily routine.
We find adequate support for these findings in the testimony of social workers, the mother, the father, and Beth Cooper ("Ms. Cooper"), an infant-toddler specialist. DSS arranged for Ms. Cooper to help the parents understand D.L.W.'s special medical needs. Ms. Cooper worked with the parents during six visits between February 2003 and June 2003, while DSS supervised all six visits. Ms. Cooper testified as follows:
Q: Now, isn't it true that, at least at times, neither parents did the stretching the way they were supposed to?
A: There was one time when Cheri actually said that she didn't  that she was uncomfortable in providing that stretching because she felt like it hurt him. And so I moved on and tried to work on doing it through play.
Q: Were you successful through play?
A: Yeah, with the  we did a better job of that.
Q: And isn't it true also that the grandparents had the same problem in doing the stretching the way they were supposed to?
A: My recollection is that they  you know, that when I showed them, that they could imitate me very well. The problem there was that they did not initiate and they didn't automatically do it unless they were asked to do it.
Q: Along those same lines, isn't it true that the grandfather rarely got on the floor with [D.L.W.], usually asking the grandmother to do so?
A: Correct.
Q: Isn't it true that the parents rarely listened when they were doing things they weren't supposed to do, like brushing hair and/or startling [D.L.W.] or holding him in certain ways?
A: There were times that they would ignore  there were times that I spoke to them and they didn't respond to things that I said. There were times when  many, many times when they didn't make eye contact with me as I was speaking.
Moreover, the mother readily admitted she was not in a position to care for D.L.W. at the time of the termination hearing. In her testimony, the mother admits she would only be in a position to care for D.L.W. if she received help from both her family and the state. Furthermore, the father also demonstrated he was not capable of taking care of D.L.W.'s special medical needs. On 31 August 2005, the father testified he currently did not know what medications D.L.W. received, he was not prepared to take D.L.W. home as of that date, and did not remember anything he read about Cerebral Palsy.
Both parents emphasized they went to all the required training sessions until the court discontinued these sessions when reunification efforts were ceased. However, the parents' attendance at the training sessions was not enough to demonstrate their ability to care for D.L.W.'s special medical needs. The evidence shows the parents did not seem to pay attention in these training sessions. During visits with D.L.W., they failed to stimulate D.L.W. and they did not engage him in his daily stretching exercises.
Furthermore, although the maternal grandparents revealed an inability to care for D.L.W.'s special medical needs, the parents nevertheless relinquished their parental rights to the maternal grandparents on 7 January 2004. After this relinquishment, the parents maintained visits with D.L.W. every other week. While it was important during these visits that the parents spent time holding D.L.W. and giving him affection, they failed to also spend time on his mandatory stretching exercises. Moreover, instead of encouraging D.L.W. to initiate active play with his toys to enable him to stretch his muscles, the parents activated the toys for D.L.W. Their visits did not help him learn new things on his own. The fact that both parents voluntarily relinquished their parental rights to the maternal grandparents clearly shows both parents were willing to give up their parental responsibilities and were willing to allow someone else to care for D.L.W.
Thus, the evidence of the parents' inability to provide the proper medical care for D.L.W., their inability to remember D.L.W.'s medicines, and their voluntary relinquishment of their parental rights satisfies the clear, cogent and convincing evidence standard. This supports the trial court's findings of fact concerning respondents' failure to adequately learn to provide proper exercises, training, and medical care to D.L.W. These assignments of error are overruled.

II. Proper advocates
Both parents contend the court erred in concluding that clear, cogent and convincing evidence supported findings of fact that the parents failed to effectively advocate for their minor son. The parents contest the findings that: (1) they did not show the court they could appropriately advocate for D.L.W.; (2) after revoking their parental relinquishment documents, they did nothing to advocate for D.L.W. or attempt to reunify with D.L.W.; (3) they offered no plausible explanation as to how D.L.W. was harmed; (4) they did nothing to assist the police in helping determine who harmed D.L.W.; and (5) they did not participate in long-term mental health therapy as recommended in their 2003 psychological evaluation.
The mother argues the trial court's findings of fact that both parents were not proper advocates for D.L.W. improperly shifts the burden of proof to the parents. The burden in a termination proceeding is on the party seeking to terminate the parental rights. N.C. Gen. Stat. § 7B-1109(f) (2005). However, the trial court's findings did not improperly shift the burden of proof to the parents. The trial court must affirmatively state in its termination order "the standard of proof utilized in the termination proceeding." In re Church, 136 N.C. App. 654, 657, 525 S.E.2d 478, 480 (2000).
Here, the trial court affirmatively states in its termination order that the findings of fact are supported by clear, cogent and convincing evidence. Therefore, the trial court did not improperly shift the burden of proof to the parents. We now determine whether the trial court's findings of fact regarding the parents' inability to properly advocate for their son are supported by clear, cogent and convincing evidence.
While the mother cooperated with law enforcement by taking a polygraph test, the father told the mother he took a polygraph test when in fact, he did not. However, when the father told the mother he had taken the polygraph test, the mother did not ask him for the results. Moreover, the father and mother continued to live together at the time of the termination hearing. The evidence supports the trial court's determination that the mother did not do everything possible to learn who hurt her son.
Furthermore, for the first time since D.L.W. was injured in 2003, the mother told the court that her uncle may have harmed D.L.W. However, the mother testified she did not confront her uncle about D.L.W.'s injuries. Dr. Karen Yoch ("Dr. Yoch"), a licensed psychologist, testified that she performed a psychological evaluation on the mother and detected a lack of rage existed against the individual who harmed her son.
Both parents admit in their testimony they were the sole custodians of D.L.W. the night he was injured. Although both parents agreed D.L.W. was a "shaken baby," neither parent had a plausible explanation for how he was injured. The parents repeatedly told social workers, the police, and the court they had no idea what happened to their son. Additionally, both parents testified at the termination hearing they currently were not in a position to care for D.L.W. It was apparent that neither properly advocated for D.L.W. by actively trying to determine who harmed D.L.W. and learning how to take care of his special medical needs.
Although the parents learned the maternal grandparents were unable to care for D.L.W., neither parent asked to be given instructions on how to care for D.L.W.'s special medical needs. After revoking their relinquishment, the parents' involvement with D.L.W. was minimal except for visits with D.L.W. During the visits, they held D.L.W., but did not attempt to stimulate him or perform any stretching exercises with him. Additionally, the father did not visit his son in the months prior to the termination hearing.
The mother argues she was not specifically ordered to participate in mental health therapy; therefore, she had no notice that she was required to engage in therapy in order to obtain custody of her son. Dr. Yoch testified that she thought the mother had little motivation to participate in individual therapy because the mother did not believe she had any problems.
Moreover, the social worker testified he included his recommendation in the parents' psychological reports that they may benefit from therapy. Unfortunately, neither parent believed they needed therapy. Therapists told the social worker, in their experience, people with no insight regarding the need for therapy not only fail to benefit from attempts at participating in therapy, but also waste the therapists' time. Therefore, DSS did not arrange for either parent to begin therapy.
The father failed to bring forward any argument concerning the recommendation in his psychological evaluation for him to participate in long-term mental health therapy and therefore abandons this argument. N.C.R. App. P. 28(b)(6).
Thus, we find there is clear, cogent and convincing evidence to support the trial court's findings of fact regarding the parents' inability to properly advocate for their son because properly advocating for D.L.W. included assisting the police in determining who injured their son and acknowledging they could benefit from mental health therapy. These assignments of error are overruled.

III. Grounds for termination
Both parents contend the court erred in concluding that clear, cogent and convincing evidence supported its conclusions that grounds existed to terminate respondents' parental rights and that termination of their parental rights was in the child's best interests. We disagree.
To terminate one's parental rights, the petitioner must show by clear, cogent and convincing evidence that a statutory ground to terminate the rights exists. In re Young, 346 N.C. 244, 247, 485 S.E.2d 612, 614 (1997). The court's determination of the existence of a ground is a conclusion of law. In re Helms, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675-76 (1997). "Our review of a trial court's conclusions of law is limited to whether they are supported by the findings of fact." Id. at 511, 491 S.E.2d at 676 (citation omitted).
The court found three statutory grounds under N.C. Gen. Stat. § 7B-1111(a) (2005) to terminate the respondents' parental rights: (1) the parents abused the child; (2) the parents neglected the child; and (3) the parents willfully left the child in a placement outside the home for a period of more than twelve months without showing to the satisfaction of the court that reasonable progress was being made to correct the conditions which led to the removal of the child.
Although only one statutory ground is required to terminate parental rights, Shermer, 156 N.C. App. at 285, 576 S.E.2d at 407, we address two grounds. First, the court found that both parents abused the child. At the time the trial court conducted the termination hearing in this case the relevant portion of the controlling statute allowed a trial court to terminate parental rights if, "[t]he parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101." N.C. Gen. Stat. § 7B-1111(a)(1) (2005).
However, "[w]here . . . a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, the trial court must employ a different kind of analysis to determine whether the evidence supports a finding of neglect." In re Pierce, 146 N.C. App. 641, 651, 554 S.E.2d 25, 31 (2001). Petitioner must prove that neglect existed at the time of the termination hearing and there was the probability of a repetition of neglect. In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). The determinative factors are the best interests of the child and the ability of the parent to care for the child at the time of the hearing. Id. Termination of parental rights for neglect may not be based solely on past conditions that no longer exist. Id. at 714, 319 S.E.2d at 231-32. Furthermore, "the law and reasoning of Ballard apply equally when parental rights are terminated pursuant to a finding of abuse." In re Alleghany County v. Reber, 75 N.C. App. 467, 470, 331 S.E.2d 256, 258 (1985).
The trial court's findings of fact clearly support the trial court's conclusion that both parents abused D.L.W. and that there was a probability of the repetition of abuse in the future. Initially, all parties consented to the finding that D.L.W. was abused in the adjudication order entered 20 November 2002.
Furthermore, there is clear evidence that there is a probability of the repetition of abuse. Both parents admitted and testified that D.L.W. was in their sole custody when he was harmed. Both parents acknowledged that D.L.W. was a "shaken baby." Yet, neither parent provided a plausible explanation for how D.L.W. was injured. Neither parent tried to assist law enforcement to determine who injured their son. Although the mother passed a polygraph test, she never asked the father for his polygraph results. She also testified at the termination hearing that she continued to live with the father and indicated there was no reason for her to discontinue living with the father. Dr. Yoch testified that both parents lacked any sort of rage towards the person who harmed their son.
Aside from abuse, the trial court correctly concluded that both parents neglected the child. A neglected juvenile is one "who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned . . . or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law." N.C. Gen. Stat. § 7B-101(15) (2005). "When the court's findings of neglect are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary." In re Williamson, 91 N.C. App. 668, 674, 373 S.E.2d 317, 320 (1988) (citation omitted).
First, at the adjudication, the parents consented to the trial court's finding that D.L.W. was neglected. The evidence is overwhelming that neither parent grasped the seriousness of D.L.W.'s injuries, nor understood how to care for his special medical needs. The parents could not name D.L.W.'s medications or properly state all of D.L.W.'s ailments. The parents repeatedly were given lengthy instruction on how to properly care for D.L.W. However, when respondents had the opportunity, they continually failed to help D.L.W. with his stretching exercises and failed to properly hold him. Both parents testified at the termination hearing that they were not prepared to care for D.L.W. Both parents readily relinquished their parental rights to the maternal grandparents to take the responsibility of caring for their child. Furthermore, Dr. Yoch testified that the father did not understand what was necessary to raise a child with severe disabilities. These facts clearly support the trial court's conclusion that neglect existed at the time of the termination hearing and that there was a probability of a repetition of neglect.
We therefore conclude the evidence supports the trial court's findings of fact and conclusions of law that grounds existed to terminate respondents' parental rights. After determining that at least two grounds exist, we need not consider the third ground found by the trial court. See In re Davis, 116 N.C. App. 409, 413, 448 S.E.2d 303, 305 (1994). After the initial phase of finding at least one ground for termination, the trial court proceeds to the dispositional phase and considers whether termination is in the best interests of the child. Shermer, 156 N.C. App. at 285, 576 S.E.2d at 406-07 (citation omitted). The determination of whether termination of parental rights is in the best interests of the child is in the discretion of the trial court and will not be disturbed absent an abuse of discretion. In re I.S., 170 N.C. App. 78, 89, 611 S.E.2d 467, 474 (2005) (citation omitted); In re Allred, 122 N.C. App. 561, 569, 471 S.E.2d 84, 88 (1996) (citation omitted).
Social workers discovered after the parents visited the minor child, the child exhibited stressed breathing and disrupted sleep patterns upon returning to his foster home. Additionally, after the parents visited D.L.W., the child cried throughout the night and became so agitated he was not able to properly participate in physical therapy the following day.
Although the parents visited the minor child and attended six classes on how to care for the minor child, the trial court found the continuation of the parental relationship would not provide stability and permanency for the minor child. Even after lengthy instructions on how to care for D.L.W., the parents repeatedly failed to follow these instructions and failed to properly perform stretching exercises and stimulate his muscles. Although respondents were told the child does not like objects in his face or having his head touched, the parents repeatedly touched his head and were constantly near the child's face. The parents continually could not repeat the names of D.L.W.'s medications. Also, respondents seldom held the minor child properly to prevent him from accidentally throwing himself backwards.
At the termination hearing, both parents testified they were not ready to care for their minor child. The father missed scheduled visits with D.L.W. leading up to the termination hearing, missed some of the court hearings, and refused to take a polygraph test. Furthermore, the parents readily relinquished their parental rights to the maternal grandparents and continued to live together on the date of the termination hearing. Respondents failed to fully comprehend the seriousness of their son's injuries, the amount of care required to properly raise their son, and the responsibility involved in caring for such a severely handicapped child.
The parents argue termination of their parental rights is not in the minor child's best interests because after termination the minor child will have no future permanence. However, the parents do not present any evidence showing the minor child is incapable of being adopted. We find this argument without merit. Based upon the trial court's findings we find no abuse of discretion in the trial court's conclusion that termination is in the child's best interests. This assignment of error is overruled.

IV. The Father
Finally, we address the issues that only the father argues. The father contends the court erred in concluding that clear, cogent and convincing evidence supported the findings of fact that he was not in a position to care for D.L.W. Specifically, the father contests (1) the validity of the termination order due to a clerical error in the order; (2) the father admitted he would not be in a position to care for the minor child for at least six months from the date of the termination hearing; (3) the father has not visited his son on a regular basis; (4) the father required constant prompting to be able to assist in the care of D.L.W.; (5) the father's conduct demonstrated that he will not be able to promote the healthy and orderly, physical, and emotional well-being of the minor child; and (6) the minor child is immediately in need of a permanent plan of care which can only be obtained by severing the parents' parental rights.
We first address the issue of the clerical error in the termination order. The father argues the court's clerical error in the termination order rendered the termination order ineffective a sit relates to him. Therefore, the father believes his parental rights as to D.L.W. were not terminated and proceedings subsequent to the entry of the termination order are a legal nullity. The trial court's termination order consists of two separate decrees. In decree number two, the order reads as follows: "That the parental rights of Donald . . . [W], father of the child, Cheri . . .[H], are hereby terminated." There is only one minor child in this case and the child's name is D.L.W. The trial court inadvertently used the mother's name, Cheri, rather than the child's name. Thus, the trial court's error with the names in the termination order is an obvious clerical error.
"The judgment of the trial court is presumed to be regular and valid." In re Peirce, 53 N.C. App. 373, 389, 281 S.E.2d 198, 208 (1981) (citation omitted). Here, we compare the wording in the trial court's order in decree number one that terminates "the parental rights of Cheri . . . [H], mother of the child" with the wording in decree number two. Therefore, it is obvious by comparing the clauses in decree numbers one with number two that the trial court intended to terminate the parental rights of both parents. Furthermore, since there is only one minor child and only one mother involved in this matter, it appears, and the evidence strongly supports, the trial court intended to terminate the parental rights of both parents. This error can be easily corrected by remanding the order to the trial court to replace the mother's name for D.L.W.'s name in decree number two. Thus, we find no prejudicial error.
The father next contests the findings concerning his ability and willingness to care for his minor child. In the father's testimony, when asked if he was prepared to take his son home that day, the father testified, "I can tell you right now I ain't prepared for that right now, no." Moreover, the father testified he researched about his son's illness, Cerebral Palsy, when D.L.W. was first diagnosed, but when asked, he could not remember anything he read about the disease. The father also testified he currently did not know if his son was taking medication for high blood pressure and seizures. The father could not recall from one visit with his son to another why D.L.W.'s arms were so rigid and why D.L.W. needed to be stretched on a consistent basis.
The father missed some of the scheduled visits with D.L.W. prior to the termination hearing and was forty minutes late for a one hour visitation prior to the termination hearing. In the adjudication order, the parents acknowledged D.L.W. was a "shaken baby" and consented that one of them perpetrated D.L.W.'s injuries. Additionally, the parents acknowledged D.L.W. was in their sole custody when he was injured. The father refused to take a polygraph test, lied to the mother about taking the polygraph test, and repeatedly told the police and social workers he did not know how D.L.W. was injured.
Thus, the evidence of the father's inability to remember his son's medications, failure to conduct his son's stretching exercises, and reluctance to assist law enforcement in determining who injured his son satisfies the clear, cogent and convincing evidence standard and supports the trial court's findings of fact. These assignments of error are overruled.
Respondents have failed to bring forward any arguments concerning their remaining assignments of error; therefore, they are deemed abandoned and we need not address them. N.C.R. App. P. 28(b)(6). The order terminating respondents' parental rights is affirmed but we remand to the trial court for the sole purpose of correcting the clerical error in the trial court's order terminating the parents' parental rights.
Affirmed and remanded with instructions.
Judges GEER and JACKSON concur.
Report per Rule 30(e).
NOTES
[1] The trial court states in its finding of fact #18 that the parents "allowed the paternal grandparents to receive the essential training on how to care for [D.L.W.]." However, the trial court made a clerical error in its findings of fact because only D.L.W.'s maternal grandparents received training on how to care for D.L.W.'s special medical needs.