An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1300
NORTH CAROLINA COURT OF APPEALS

Filed: 20 May 2014

IN THE MATTER OF:

|  | New Hanover County |
|---|---|
| A.R.S., E.D.S., M.S.S. | Nos. 11 JT 73-75 |

Appeal by respondent from order entered 13 September 2013 by Judge J.H. Corpening, II in New Hanover County District Court. Heard in the Court of Appeals 28 April 2014.

> *Regina Floyd-Davis for petitioner-appellee New Hanover County Department of Social Services.*

> *Parker Poe Adams & Bernstein LLP, by Deborah L. Edney and Sarah Fulton Hutchins, for guardian ad litem.*

> *Assistant Appellate Defender Joyce L. Terres for respondent-appellant.*

HUNTER, Robert C., Judge.

Respondent, the mother of the juveniles A.R.S., E.D.S., and M.S.S. ("Amy, Emily, and Michael")[1], appeals from an order

---

[1] The pseudonyms "Amy, Emily, and Michael" are used throughout this opinion to protect the juveniles' privacy and for ease of reading.

terminating her parental rights. After careful review, we affirm.

## Background

Respondent and C.S. ("Charles")[2], the father of the juveniles at issue in this appeal, were married in July 2003. Prior to her marriage to Charles, respondent had three children, C.F.H., C.H.W., and P.R.W. ("Cindy, Carl and Peggy").[3] On 18 March 2011, the New Hanover County Department of Social Services ("DSS") filed a petition alleging that Amy, Emily, Michael, Cindy, Carl and Peggy were neglected juveniles. DSS alleged that respondent and Charles had a "ten year history of domestic violence, with numerous incidents occurring in the presence of the children." DSS recounted that, while the family was living in Tennessee, Cindy, Carl, Peggy and Amy had been placed in foster care due to domestic violence. Charles was convicted of felony child abuse for a physical assault on Carl and had also physically assaulted Cindy. Respondent was directed by the

[2] The pseudonym "Charles" is used throughout this opinion for ease of reading.

[3] The pseudonyms "Cindy, Carl and Peggy" are used throughout this opinion to protect the juveniles' privacy and for ease of reading.

juvenile court in Tennessee to "choose between [Charles] and the children." The juveniles were returned to respondent's care in December 2009.

In 2010, respondent moved to New Hanover County in North Carolina. In October 2010, while pregnant with twins Emily and Michael, respondent transported Charles to New Hanover County and paid for his separate lodging. DSS, upon learning of the previous history of domestic violence, put a safety plan into effect requiring Charles's contact with Cindy, Carl and Peggy to be supervised by someone other than respondent. Charles was eventually allowed unsupervised contact with his biological children, Amy, Emily, and Michael. However, DSS later learned that Charles was having unsupervised contact with Cindy, Carl and Peggy.

DSS alleged that Cindy, Carl and Peggy were "in fear of [Charles] and fear for the safety of their mother as well. They appear depressed and [Cindy] has expressed suicidal ideation." DSS claimed that Charles continued to be verbally abusive to all members of the family and had physically assaulted Cindy. DSS further alleged that respondent had failed to protect the children from Charles's abuse and had chosen to continue her

relationship with him. Accordingly, the children were removed from respondent's custody.

On 13 May 2011, all six juveniles were adjudicated neglected based on stipulations by respondent and Charles to the allegations in the petition. The court ordered that custody remain with DSS. Additionally, the court ordered that Charles was to have no contact with Cindy, Carl and Peggy, and that respondent and Charles were to have separate visitations with Amy, Emily, and Michael.

On 7 November 2011, the court entered a review order in which it expressed concern regarding respondent's "dishonesty with her children" about her relationship with Charles. The court found that respondent had indicated that she had obtained separate housing from Charles and had severed the relationship, but in fact she continued to reside with him until 6 September 2011, at which time she moved to a domestic violence shelter. Despite moving to the shelter, respondent continued to maintain a relationship with Charles, while at the same time telling her children the relationship was over.

Another review hearing was held on 2 May 2012. The trial court found that DSS received a Child Protective Services report on 12 January 2012 alleging sexual abuse perpetrated by Charles

upon Cindy. The allegation was substantiated by DSS, and DSS substantiated an allegation of neglect as to respondent for leaving her children with Charles in violation of a safety plan then in existence. The trial court also found as fact that respondent and Charles had in fact maintained a relationship from March of 2011 through 4 February 2012, and that respondent had not been truthful with the court regarding their continued contact. The trial court relieved DSS of further reunification efforts and changed the permanent plan for the juveniles to custody or guardianship with a relative or court-approved caretaker.

At a review hearing held on 3 January 2013, respondent requested that the permanent plan be changed to reunification. The court noted in its order that on 18 October 2012, Charles committed suicide. The court expressed its opinion that Charles's death was a "significant event, as opposed to a substantial change in circumstances." The court continued to be concerned about respondent's "failure to prioritize her children, and poor decision-making. She failed to keep the children safe in the past, and they are still at risk." The court declined to change the permanent plan for the juveniles to reunification. Following a review hearing on 4 April 2013, the

court changed the permanent plan for Amy, Emily, and Michael to adoption.

On 4 June 2013, DSS filed a petition to terminate respondent's parental rights to Amy, Emily, and Michael. On 13 September 2013, the trial court entered an order terminating respondent's parental rights to Amy, Emily, and Michael after concluding that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) and (2) (2013). Respondent appeals.

**Discussion**

We first consider respondent's argument that the trial court erred by concluding that grounds existed to terminate her parental rights. We disagree.

N.C. Gen. Stat. § 7B-1111 sets out the statutory grounds for terminating parental rights. A finding of any one of the separately enumerated grounds is sufficient to support termination. *In re Taylor*, 97 N.C. App. 57, 64, 387 S.E.2d 230, 233-34 (1990). "The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law." *In re D.J.D.*, 171 N.C. App. 230, 238, 615 S.E.2d 26, 32 (2005) (citing *In re Huff*, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000), *disc. review denied, appeal*

*dismissed*, 353 N.C. 374, 547 S.E.2d 9 (2001)).

In the instant case, the trial court concluded that grounds existed to terminate respondent's parental rights based on neglect. N.C. Gen. Stat. § 7B-1111(a)(1). "Neglected juvenile" is defined in N.C. Gen. Stat. § 7B-101(15) as:

> [a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.

N.C. Gen. Stat. § 7B-101(15) (2013). "A finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." *In re Young*, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997). Where, as here, a child has been removed from the parent's custody before the termination hearing, and the petitioner presents evidence of prior neglect, then "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). Additionally, the determination of whether a child is neglected "must of necessity be predictive in

nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999).

Here, the trial court first made substantial findings of fact concerning the family's history in Tennessee, which included: domestic violence perpetrated by respondent and Charles in front of their children; the removal of respondent's children from her custody; entry of an order of protection prohibiting Charles from having contact with respondent's children; respondent's withdrawing the order of protection; Charles's conviction of child abuse and domestic assault; entry of a "no-contact" order by a Tennessee juvenile court prohibiting contact between Charles and respondent's children; subsequent violation of the no-contact order by Charles; removal of respondent's children from her care due to her allowing contact between her children and Charles; and restoration of custody to respondent in 2009.

The trial court further found as fact that Charles filed a motion in Tennessee to lift the no-contact order, "indicating his intent 'to move to North Carolina with [respondent] and the children, to get a residence in North Carolina and to get a job

in North Carolina.'" The motion was denied, with the exception that Charles was allowed unsupervised contact only with Amy. Nevertheless, as found by the court, in October 2010, respondent transported Charles to North Carolina and they resided together with the juveniles as a family. The court found that respondent's "actions clearly violated the Tennessee Court Order." The juveniles were subsequently adjudicated neglected.

The trial court made the following findings concerning respondent's actions occurring after the adjudication of neglect:

> 17. That approximately three months later [after the adjudication of neglect], at a hearing held on 20 July 2011, [respondent] appeared to be making progress. . . . She presented to the Court a twelve month lease . . . for a home located in New Hanover County, separate and apart from her husband, [Charles]. She maintained employment, but had not participated in any parenting classes.
>
> 18. That subsequent to the July hearing, the Department learned that [respondent] was not truthful with the Court. She had not and did not move into the residence presented via lease, but in fact, maintained housing with [Charles]. She was dishonest with [Cindy, Carl and Peggy] about the continued living arrangements and continued relationship with [Charles], which led to continued trust issues for the Juveniles . . . .

19. That [respondent] continued to reside with [Charles] until on or about 06 September 2011, when she moved to the Domestic Violence Shelter. Thereafter, she continued to have contact with [Charles]. She was observed at [Charles's] residence on two occasions. She continued to deny the relationship to [Cindy, Carl and Peggy]. At the review hearing held on 10 October 2011, [respondent] presented to the Court that she had secured housing at Greentree Apartments. She has yet to reside in Greentree [A]partments, and has not participated in any parenting classes. She has participated in family therapy; however, there has been inconsistent participation in individual therapy.

. . . .

21. That on or about 17 February 2012, [Charles] contacted [DSS] and provided relevant information. [Charles] and [respondent] had maintained a relationship from September of 2011 until [Charles] was incarcerated in February of 2012. [Charles] was hospitalized in Chapel Hill, North Carolina, and [respondent] visited him on several occasions. [Respondent] maintained telephone contact with [Charles] through use of [Charles's] land line, which was unknown to the Department. [Charles] frequented [respondent's] residence during said period, and met in other places, so as not to alert the Department. That [respondent] has been dishonest with the Court, the Department, the Guardian Ad Litem, and [Cindy, Carl and Peggy].

. . . .

23. That [Charles] committed suicide on or about 18 October 2012. Despite having the children [Cindy, Carl and Peggy] removed

from Respondent-Mother's custody due to their physical abuse by [Charles], and having been aware of [Charles's] sexual abuse of [Cindy], [respondent] presented the older children with amulets containing [Charles's] ashes, which could be worn around their necks. [Respondent] denies constructing the amulets, but did in fact present them to the children.

. . . .

26. That [Charles] untimely demise is noted; however, [respondent] has continued a pattern of placing her self-interests ahead of her children's best interests for the past five (5) years. The family's involvement with the Tennessee Department of Children's Services' [sic] began in 2008, and [respondent's] involvement with [DSS] has continued since 2010. This pattern is indicative of a high probability of the repetition of neglect.

Respondent does not challenge the above findings of fact and they are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). Based on these findings, we conclude that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) to terminate respondent's parental rights.

Respondent additionally argues that the trial court erred by concluding that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) to terminate her parental rights. However, because we conclude that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) to support the trial court's order, we

need not address the remaining ground found by the trial court to support termination. *Taylor*, 97 N.C. App. at 64, 387 S.E.2d at 233-34.

Respondent next argues that the trial court abused its discretion when it concluded that termination of her parental rights was in the best interests of the juveniles. We disagree.

Once statutory grounds for termination have been established, the trial court is required to "determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a) (2013). When determining whether it is in the juvenile's best interest to terminate the parent's rights, the trial court is required to make written findings regarding the relevant factors enunciated in N.C. Gen. Stat. § 7B-1110(a). *Id.* "We review the trial court's decision to terminate parental rights for abuse of discretion." *In re Anderson*, 151 N.C. App. 94, 98, 564 S.E.2d 599, 602 (2002).

Here, in its dispositional findings, the trial court found the following facts relating to the factors stated in N.C. Gen. Stat. § 7B-1110(a):

> 28. That maternal and paternal relatives have been considered for placement of the Juveniles, and it is not in their best interests to be placed with relatives. The

Juveniles should remain in this community wherein they can continue the strong bond and relationship, which they share with [Cindy, Carl and Peggy] through visitation. The children do not have a strong bond with any of the relatives previously considered by this Court.

29. That [Amy] has been in her current placement since April 1, of 2011. She is five years old, and has been in and out of home placement for two years and five months. This is her second time in foster care since birth. [Emily and Michael] are two and a half year old twins, have been in placement together since March of 2011, and were moved into their current placement with their sister, [Amy] in April of this year. [Amy] has a strong bond with the foster parents, and [Emily and Michael] have developed a bond in the short time they have been placed. [Amy, Emily and Michael] have a strong sibling bond. The Juveniles have a bond with their mother; however, it has been diminished by the length of time in out of home placements. The twins were three (3) months old when they were removed from [respondent]. The foster parents have encouraged and arranged visitations for [Amy, Michael, Emily, Cindy, Carl and Peggy and] have indicated their willingness to continue[] said sibling visitations.

30. That [Amy, Emily and Michael] are young children, and their current foster parents would like to adopt all three of them.

Respondent contends that the trial court should have given greater consideration to placement with the paternal grandparents. However, such consideration was not required. *See In re M.M.*, 200 N.C. App. 248, 258, 684 S.E.2d 463, 469-70

(2009) ("A trial court may, but is not required to, consider the availability of a relative placement during the dispositional phase of a hearing to terminate parental rights."), *disc. review denied*, 364 N.C. 241, 698 S.E.2d 401 (2010).

Respondent further contends that the court failed to consider the impact of unenforceability of an order for sibling visitation should the juveniles be adopted by their foster parents. We conclude, however, that the trial court was not statutorily required to consider the enforceability of post-adoption sibling visitation. Nevertheless, it is apparent from the court's findings that the court considered the importance of sibling visitation, and concluded that it was likely to occur, regardless of its legal enforceability.

## Conclusion

Based on the court's dispositional findings of fact, we conclude that the trial court's determination that it was in the juveniles' best interests to terminate respondent's parental rights was not manifestly unsupported by reason. Accordingly, we affirm.


AFFIRMED.

Judges GEER and McCULLOUGH concur.

Report per Rule 30(e).